MAR 21 2008

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

QUEEN A. TIYE SEARLES )
                      Plaintiff, )
                              )
            v.                  )
                              )
BOARD OF EDUCATION OF THE CITY OF CHICAGO; )
ARNE DUNCAN, Chief Executive Officer; )
RACHEL RESNICK, Board Chief Labor Relations Officer )
                        Defendants. )

CIVIL ACTION
07cv 6548
No. 07 C 6548
Judge Nordberg
Magistrate Nolan

## <u>RESPONSE TO DEFENDANTS' MOTION TO DISMISS</u>
## COMPLAINT OF EMPLOYMENT DISCRIMINATION

      Plaintiff, Queen Tiye Searles, respectfully demands that this Honorable Court not be

beguiled by the defendants' insubstantial Motion to Dismiss Plaintiff's Complaint of

Employment Discrimination and that their motion to dismiss be denied in its entirety and that

plaintiff is afforded the right to have a trail by a jury of her peers. Defendants' have

misrepresented the facts as stated in plaintiff's complaint and otherwise; are attempting to lead

this Court to believe that plaintiff has filed three lawsuits relative to the facts herein complained

of; that plaintiff has been in willful violation of an order entered by this Honorable Court related

to the complaint herein; and that plaintiff has not stated a claim upon which relief can be granted

in the complaint. Defendants further base their argument on Res Judicata, which is totally void of

merit.

      In defendants' Motion to Dismiss, they state as a fact that Plaintiff was placed on a 25

month leave and references plaintiff's Complaint at ¶ 13(i) in support thereof. Directing the

Court's attention to Plaintiff's Complaint *ibid.* and to the actual letter setting forth the limits of

the mandatory leave at Plaintiff's Exhibit A *(a copy of plaintiff's Complaint filed in civil court

for Intentional Infliction of Emotional Distress, with a Chronological History & Booklet of*

*Supporting Documents)* included herewith for the Court's convenience and made a part hereof by reference. A prima facie examination of the letter makes it clear that the defendant's initially intended for the mandatory leave to begin on September 22, 2003 and end on September 23, 2005 and further establishes that plaintiff did not take a leave as defendants' state; and that she was in fact forced on a mandatory unpaid leave without administrative due process or otherwise being given notice of any psychotic behavior that required her to submit to an examination.

The issues in this case are clearly distinguishable from any previous or subsequent cases filed regarding the defendants' actions to place plaintiff on an immediate mandatory unpaid psychologically unfit to teach leave based on a one-time 40 minute interview with a Board appointed clinical psychologist without even a second opinion. In the present case before this Honorable Court, Plaintiff is seeking relief from discriminatory practices that the defendants engaged in by not allowing plaintiff to return to work at the end of a predetermined leave, notwithstanding that she complied with all requirements. The goals of the Americans with Disabilities Act (ADA) "are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities, which includes a physical or mental impairment that substantially limits one or more of the major life activities of such individuals and includes those who are regarded as having such an impairment.

This cause is a result of the defendants' collective refusal to provide plaintiff with work or accommodations that would allow her to remain economically self-sufficient from September 25, 2005 through February 6, 2006. Defendants' action directly caused plaintiff to loss her property, which she would have been able to save had she been returned to work at the scheduled time as Honorable Judge Goldgar granted the plaintiff several extensions based on plaintiff's contention that she would be returning to work and could therefore sustain a bankruptcy.

The present case cannot be *res judicata*, as there are no issues in the present case that can be litigated in the circuit court and the issues raised are substantially different than either complaint formerly filed. The appellate decision that defendants cite in their motion to dismiss results from a complaint for Administrative Review. The circuit court has complete jurisdiction over administrative review cases. The November 12, 2003 case the defendants also reference, cannot be res judicata because it results from facts that existed well before the discriminatory acts committed beginning on September 23, 2005 and there is no way that plaintiff could have raised the present issues in either of the previous cases. Therefore, there is no identity in the causes of action between the instant case and the two cases the defendants raise.

The November 12, 2003 case, which was originally filed in Chancery and erroneously removed to Federal Court based on issues raised in Count II for due process, is based on facts as they existed prior to November 12, 2003. The present case does not deal with administrative issues or due process issues; it deals wholly with discrimination, specifically arising from the defendants treating plaintiff as if she had mental disorders which prevented her from resuming her position as a teacher on September 25, 2005 at the end of the defendants' predetermined leave. If a claim emerges from the same "core of operative facts", it has "identity" as that earlier action. *Brozstowski v. Laidlaw Waste Systems*, 49 F.3d 445 (7th Cir. 1995), *citing Colonial Penn Life Ins. Co. v Hallmark Ins. Admin., Inc.* 31 F.3d 445, 447 (7th Cir. 1994). For the purposes of res judicata, two claims are one if they are based upon the same, or nearly the same factual allegations.

The defendants' Motion to Dismiss must be denied because it is apparent from the face of Plaintiff's Complaint that the three requirements for *res judicata* to apply are not present in the instant case: (1) There was no final judgment on the merits rendered by a court of competent jurisdiction; (2) there is not an identity of course of action; and (3) there is not an identity of

3

parties and their privies. In the former cases, Ruth Moscovitch, former General Counsel; Sunil Kumar, Assistant General Counsel; Ascencion Juarez, Wendy Haas, Gwendolyn Boyd and Thomas Lambert were all named as defendants, whereas in the present case, the only defendants are The Board of Education, Arne Duncan and Rachel Resnick.

In the Appellate case to which the defendants refer, the case was dismissed for lack of subject matter jurisdiction, which does not constitute a *final judgment on the merits*. In the federal case before Judge Guzman, plaintiff did not "willfully and defiantly" violate the court's order. The defendants' misrepresented to the court plaintiff's responses to the scheduled disposition and prevaricated to the court that plaintiff indicated that:

> "...she was unable to attend a deposition because she was out of town on vacation and that even if she were in Chicago she would not attend the deposition because she is entitled to a vacation. She may be available at some unspecified future date when she is done resting and that she does not deserve to be deposed and instead deserves a hearing because she needed a vacation from the defendants."

To the contrary, to set the record straight, plaintiff contacted Sunil Kumar and informed him prior to the scheduled deposition that she was out of town and requested to complete the deposition over the telephone. Mr. Kumar told plaintiff that this was not possible. While this has no barring on the issue of res judicata, it is important to plaintiff that this Court does not view her as one who would blatantly disrespect this Honorable Court. Plaintiff further informed counsel for the defendants that she was preparing to file a case in the United States Supreme Court for Writ of Certiorari, which took plaintiff over two months to prepare. Plaintiff has not had a vacation for nearly 10 years and never made such statements to defendants or their representatives.

Count 1 of plaintiff's complaint, which defendants removed from circuit court to federal court, was a Petition for Writ of Certiorari based upon the administrative orders of September 10 and September 22, 2003 respectively. Administrative review is under the jurisdiction of the state

court and should not have been moved to the federal court. Additionally and alternatively, the issues in the case are not identical and arise out of a separate set of circumstances as the present cause is one of discrimination. Nichols III Civ Prac §90.07 states in part that "Where a genuine disputed issue of fact is raised, the court must deny the motion if a party is entitled to a jury trial and has timely filed a jury demand."

Plaintiff maintains that the defendants' motion to dismiss the complaint on the basis of res judicata is a dilatory claim raised to further deny plaintiff justice based on the merits of the cause of discrimination as complained of in this cause and submits as further evidence for the court to consider a Chronological History and a Booklet of Supporting documents in making a determination as to whether these are the same facts from a previous law suit filed or the subsequent case filed on February 5, 2008 in the circuit court. Res judicata is not meant to barr a party from filing a subsequent claim if the claim would not have been a core proceeding in the prior matter with respect to which a judgment was entered. The doctrine of res judicata should only be applied to facts and conditions as they existed when the judgment was entered. (Nichols III Civ Prac §90.03).

In conclusion, and for the aforesaid reasons, plaintiff respectfully request that this Honorable Court deny the defendants' motion to dismiss.

**Dated:  March 21, 2008**

Respectfully submitted,

Queen Tiye Searles,
Litigant -- Pro Se
P.O. Box 6139
Chicago, Illinois 60680-6139
(773) 412-6595

5

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

| | |
|---|---|
| **QUEEN A. TÍYE SEARLES** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **BOARD OF EDUCATION OF THE CITY OF CHICAGO/** | ) |
| **CHICAGO SCHOOL REFORM FOARD OF TRUSTEES,** | ) |
| a body politic and corporate, **RUFUS WILLIAMS, President;** | ) |
| **ARNE DUNCAN**, in his official capacity as Chief Executive Officer; | ) |
| **Patrick Rock**, individually and in his official capacity as General | ) |
| Counsel; **Susan O'Keefe** in her official capacity as Deputy General Counsel; | ) |
| **Sunil Kumar**, individually and in his official capacity of Assistant | ) |
| General Counsel; **Debra Harvey**, in her official capacity as Assistant | ) |
| General Counsel and **Law Department attorneys** | ) |

2008L001297
CALENDAR/ROOM A
TIME 00:00
Tort - Intentional

### COMPLAINT
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### COUNT 1

1. Plaintiff, Queen A. Tíye Searles states that on February 5, 2006, she was processed by the Human Resources and Staffing Department to return to a position with her employer, the Chicago Board of Education City of Chicago (Board) as an elementary school teacher on February 6, 2006.

2. At the time, Plaintiff was a resident at 8729 S. Commercial Ave, Chicago, Illinois, where she was the owner of residential and commercial property and in the process of starting a for-profit and a not-for-profit business.

3. Defendants knew, or could have reasonably known, at the aforementioned time that plaintiff had been placed on a mandatory unpaid psychologically unfit to teach medical leave without pay based on a one time 40-minute interview with a Board appointed clinical psychologist which was originally scheduled from September 22, 2003 to September 23, 2005. **(See Supporting Doc 4)**

4. Notwithstanding that Plaintiff informed Defendants about a pending foreclosure and that

*Exhibit A*

she and her children were severely destitute, without food and almost homeless due to a pending

foreclosure as a result of being on a mandatory leave without notice and without pay for over two

years; Defendants refused to return plaintiff to a position even after she complied with

unreasonable demands made by Defendants.

5.  Defendants required plaintiff to under go a battery of psychiatric examinations on

December 29, 2005 at an obscure location approximately 45 miles away from plaintiff's resident.

**(Supp. Docs. 30 -30a)**

6.  Even though Defendants were informed by their doctor on or before January 12, 2006 that

not only is Plaintiff fit to return to duty, "she is ambitious and has a leader-like demeanor, is

intelligent, pleasant and a well versed individual"; they have procrastinated in and/or refused to

make plaintiff substantially whole for the ongoing injustices complained of herein. **(Supp Docs.**

**37 – 38)**

7.  Defendants have known, or could have reasonably known, that the prognosis of the

aforesaid evaluation would concur with the one submitted by plaintiff from her personal doctor on

September 17, 2005 in compliance with directives from Defendant Patrick Rocks in a settlement

negations meeting held on September 2, 2005 pursuant to the directives of former Board President,

Michael Scott. **(Supp. Doc. 27, 13a-13c, 25 & 25a)**

8.  Over a period of two years, Plaintiff has submitted several opinions from psychological

professionals that are substantially contradictory to the one used as justification for removing

plaintiff from her position without communicating verbally or in writing any allegations of wrong

doings that would require such an intensive evaluation upon her return to work, including the

following:

2

a. With the help of her Senator, Plaintiff obtained an appointment with Community Mental Health Council, on **October 20, 2003**, Dr. Gail Basch, M.D. reported that plaintiff ruled out for major depression, bipolar disorder, psychotic disorder,... and that she has above average intelligence. **( Supp.Doc. 6)**

b. On **October 30, 2003**, Plaintiff's Psychotherapist, Dianne Glenn, stated, "Client appears to be very intelligent even under stress... **( Supp.Doc. 7)**

c. On **November 5, 2003**, Dr. Sharon Lieteau, MD stated plaintiff, "had no symptoms that would support a severe psychiatric illness..." **( Supp.Doc. 8)**

d. Dr. Franchot Givens, M.D., also with Community Mental Health Council, Plaintiff had "no psychotic symptoms...and required no...further follow-up, on December 13, 2005.

9. Defendants used their authority over the plaintiff to keep her oppressed and willing to submit to a battery of extremely repressive psychological testing totaling over 1500 questions, believing that a positive conclusion by their Doctor would result in a fair and equitable settlement as discussed in the September 2nd, meeting and their request for a settlement demands from plaintiff's attorney in their letter dated September 30, 2005. **(Supra Docs. 25-25a & 37-37a)**

10. Defendants knew or should have reasonably known that Plaintiff would suffer severe emotional and economic distress without being compensated for back pay and a reasonable settlement for the atrocities perpetrated against her upon her return to work on February 6, 2008.

11. The Defendants knew that throughout Plaintiff's entire teaching career she has been a High School teacher and that her area of specialization is Business, specifically, Accounting and Finance. Yet she was forced to teach in a self contained 7th grade special needs class.

3

12. Defendants were aware upon Plaintiff's return that she could have saved her property and her prospective businesses if a financial settlement was made in addition to a return to the payroll, yet they unconscionably refused to make Plaintiff whole even after Plaintiff informed them that she had no place to go and due to her credit as a result of being on an unjust leave for over two years, she was having serious challenges finding some place to rent; they persisted in their pretentious scam acting as though they had justification for reaping havoc in plaintiff's life.

13. Defendants are very aware of Plaintiff's impeccable work history; including

> leading students to winning first place competition in Computerized Accounting, Payroll Accounting, Business Law, Business Math, Information Processing…;

> assisting them in obtaining scholarships and entry into post secondary institutions;

> writing letters of recommendation and helping them to obtain career related positions with prestigious companies as early as Sophomore year;

> Planning meaningful field trips that assist students in making connection between classroom knowledge and real world life experiences.

14. Plaintiff has suffered long enough at the hands of Defendants collective gross, willful, wanton severe and extreme emotional distress and intentional indifference to plaintiff's right to life liberty and the pursuit of happiness.

15. When the former Chief Educational Director spoke to Defendant Sunil Kumar on my behalf, Defendant Kumar responded to plaintiff that, "Dr. Pittman, Arne Duncan,…no one can help you" and he along with the Law Department attorneys are willing to go to any extent to make this

4

true, including repealing Board rules to perpetrate and extend an abominable and unbearable malfeasance against an outstanding pedagogical professional.

WHEREFORE, Plaintiff demands judgment against Defendant for a sum of ONE MILLION DOLLARS ($1,000,000) AND any other remedies the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

## INTERFERENCE WITH ECONOMIC ADVANTAGE
## COUNT II

16. Plaintiff incorporates paragraphs 1 through 15 of COUNT I and further states that defendants have and continue to Interfere with Plaintiff's Economic Advantage.

17. Plaintiff has successfully test marketed over 25 gourmet food products over a period of approximately 25 years and had a reasonable expectation of starting SunVine, as she had several stores interested in carrying her products.

18. In addition, Plaintiff has been in the field of pedagogy for 25 years and had reasonable expectations to fulfill her life-long aspiration to open her own school, A Mothers Love Empowering Youth Missions.

19. Defendants have been informed of and specifically knew of Plaintiff's expectations to start the aforementioned businesses and to be an effective dedicated teacher.

20. Defendants are aware that the Plaintiff is currently working at an inner city high school where the administration is working pertinaciously to reform the school and are in need of instructors who are committed and can be in attendance daily to accomplish the arduous goals they have established to increase student achievement.

21. Plaintiff is being damaged by the intentional interference defendants caused by requiring that Plaintiff file time consuming and expensive litigation to obtain justice after defendants indicted that they would be agreeable to a settlement.

5

22. Plaintiff has grown very fond of her students even though she is not in an Accounting position and is excited about assisting administration to accomplish the vision for school improvement and learning under such visionary pedagogical professionals.

23. However, because she is living in a position where she is subjected to substandard housing for extraordinary prices and has to move constantly into inferior housing and/or neighborhoods because her credit will not afford her the amenities that she has assiduously worked toward all of her life only to have it filched by the defendants without just cause!

24. Plaintiff is preparing to move once again as the house she is renting for more than the mortgage that she paid on her mixed use property that was foreclosed, has no heat in two of the rooms, squirrels living in the attic...and more days off work due to illness, moving...court...

25. Plaintiff attended a Board meeting on June 27, 2007 to personally request s settlement to end this injustices wrote a request for settlement letter to Defendant Patrick Rock r a per his directive when Board President Rufus Williams inquired about the matter  ( **Attachment 1**)

26.  On July 12, 2007, Defendant Susan O'Keefe sent a response to plaintiff' on behalf of defendant Rocks rejecting said request. **(Attachment 2)**

27. Plaintiff includes as part of this complaint and incorporates herein by reference the attached Booklet of Supporting Documents and a Chronological History recounting the Events leading to this complaint so that the Court can be fully apprised of the depth of the Intentional Infliction of Emotional Distress that the Defendants and Interference with Economic Advantage that the Defendants are causing Plaintiff.  Plaintiff has been patient and has exhausted every means of resolving this matter without Court intervention.

28. When the Defendants returned the Plaintiff to an appointed position with the Board on

February 6, 2006, they should have included a reasonable settlement to make plaintiff whole for

the losses that she needlessly sustained due to the Defendants unreasonableness and unwillingness

to examine the facts and put an end to the outrageous deceptive practices used to destroy innocent

teachers.

WHEREFORE, Plaintiff demands judgment against Defendant for a sum of ONE MILLION
DOLLARS ($1,000,000) AND any other remedies the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Plaintiff (Pro Se Litigant)    Queen Tiye Searles
P.O. Box 6139
Chicago, Illinois 60680-6139
(773) 412-6595

**Dated: February 5, 2008**

7

P. O. Box 6139
Chicago, Illinois 60680-6139
July 5, 2007

RECEIVED
CPS LAB BOARD OF EDUCATION

2007 JUL -5 PM 1:02

Patrick Rock
General Counsel
Chicago Public Schools
125 S. Clark 7th Floor
Chicago, Illinois 60603

Greetings Mr. Rock:

Per your directives at the public Board meeting held on Wednesday June 27, 2007, I am writing
this letter requesting full back pay and return to an equivalent position to the one that I held at
Marshall High School in June 2003 prior to being wrongfully placed on a mandatory two and
one half year psychologically unfit to teach leave based on a Board Rule 4-54 one time 40
minute interview with a Board appointed clinical psychologist while not being legally
represented. As you know, the Illinois Supreme Court has ruled in favor of the lower courts in
denying my petition for an Administrative hearing. At this time I am representing myself as my
lawyer, Diedea Baumann, has chosen not to proceed any further with this cause.

As you are further aware, my former attorney accompanied me to an examination on December
29, 2005 with an independent Board selected Licensed Psychologist who conducted an
evaluation which lasted for over 5 hours and that consisted of a one hour interview, as well as,
five written standardized psychological assessments. Based on this comprehensive assessment,
my personal doctor's fitness for duty evaluation submitted on September 17, 2005 was
confirmed and I was returned to a position at Price Elementary School on February 6, 2006.

To avoid any further litigation I am requesting that the Board of Education immediately settle
this case outside of court and make me whole by tendering my full back pay including benefits
for the period of September 22, 2003 through February 2, 2006 and returning me to a position
equivalent to the Accounting position that I held at Marshall High School prior to the Board's
unjustifiable actions. Obviously, I am not teaching Accounting/Business courses at Price, where
I am in a self contained classroom and scheduled to teach a 7th /8th grade split in the fall. Staffing
me into an equivalent business position in the fall will return me to a position that I am highly
qualified to teach in compliance with the "No Child Left Behind Act".

Please respond in writing within 10 business days to this correspondence which you requested to
avoid additional litigation expenses at P.O. Box 6139, Chicago, Illinois 60680-6139.
In the event that further litigation is necessary to receive justice in this matter, in addition to the
aforementioned back pay, I will seek recovery for damages and litigation expenses. This
document is also being delivered by certified mail and in person to President, Rufus Williams.

I, Queen A. Tiye Searles, hereby affirm that the information contained herein is true and correct.

Respectfully Submitted,                    Subscribed and affirmed to before me this 5th day
                                           of July, 2007

Queen A. Tiye Searles                      Notary Public
Cc: Rufus Williams, President              "OFFICIAL SEAL"
    Et al.                                 MARTHA MENDIOLA

Attachment
(



### Board of Education of the City of Chicago
### Law Department

Patrick J. Rocks
General Counsel

125 South Clark Street
Suite 700
Chicago, Illinois 60603
Telephone 773/553-1700
FAX 773/553-1702

July 12, 2007

**VIA U.S. MAIL**

Queen A. Tiye Searles
P.O. Box 6139
Chicago, Illinois 60680-6139

Dear Ms. Searles:

At the request of General Counsel Patrick Rocks I have reviewed your letter of July 5, 2007 in which you offer to settle litigation you currently have against the Board if the Board agrees to give you backpay and benefits for a period of approximately 2 and ½ years, and also places you into an equivalent position to the one you previously held at Marshall High School.

The Board respectfully rejects your settlement offer. The Board believes it will be able to successfully defend itself against the complaint you filed with the City of Chicago Commission on Human Relations in October 2005.

Sincerely,

Susan M. O'Keefe

Susan M. O'Keefe
Associate General Counsel

SOK:pmv

*Attachment 2*

# Chronological History

**History** .

1. On **September 10, 2003**, the Principal at John Marshall High School required me to report for a Board Rule 4-54 Fitness for duty examination per a letter signed by Arne Duncan stating that, "**B**ased upon your work behavior as observed by Gwendolyn Boyd, Principal at Marshall Metro High School, you are hereby directed to report to Mercy Works… for a medical examination in accordance with the rules of the Board of Education of the City of Chicago…Failure to report…is grounds for termination."(**Doc. 1**)

2. The examination, which was originally scheduled for Wednesday **September 17, 2003**, was rescheduled verbally by Wendy Haas to a new location and date. Written confirmation rescheduling said exam was received the day after a 45 minute interview occurred with Dr. Thomas Lambert on Friday, **September 19, 2003** at 11:00 a.m. At no time prior to the 45 minute interview was i made aware that this was a **psychological** fitness for duty examination. When Dr. Lambert was questioned about this being a psychological examination rather than a physical examination as i believed that it was, he stated that, "this is part one of a complete medical examination". (**Doc. 2 & 3**)

3. No physical examination was ever conducted and on Monday morning, **September 22, 2003** i was told via telecommunications that i was found unfit to teach and that an unfit to teach medical leave was effective immediately. This was confirmed in a letter dated September 22, 2003 from Wendy Haas, Director of Employee Health Services.  Which stated that, "If you wish to present any medical evidence to contest Dr. Lambert findings, then such documentation may be sent to my attention…the Chicago Board of Education is placing you on a medical leave of absence… Your Personal Illness leave has been approved from September 22, 2003 through September 23, 2005…"(**Doc. 4**)

4. Dr. Lambert's findings, based on a one time 45 minute interview, were not made available to me for approximately three weeks and were filled with inconsistencies and mendacity. In ¶ 1 last two lines Lambert states that "[i] reported that recently [i have] been getting some help from a psychotherapist, however *due to…not having insurance and having serious financial problems [I was] not able to afford [my] sessions. She has not been under psychiatric care…*" whereas in his pessimistic prognosis he states that, "Ms Tiye Searles is not currently fit to perform her duties as a teacher…Her presentation is consistent with…Major depression, severe, psychotic features and panic disorder…She is in need of immediate psychiatric treatment…may be problematic given her resistance to…psychotropic medication *(and reportedly, having dropped out of treatment with a psychologist who suggested medication)*…"( **Doc 5**)

5. I submitted medical evidence from several psychological medical professionals as evidence contesting Dr. Lambert's findings as directed by Wendy Haas in Doc 4, including Dr. Gail Basch, M.D. Psychiatrist, Community Mental Health Council, who on **October 20, 2003** reported that I rule out for "major depression, bipolar disorder, psychotic disorder, she described my Affect, Thought Process, Thought Content, Attention , Speech and Appearance as within normal limits (WNL); found no Anxiety, Aggression, Compulsions and prescribed no medication, vastly contrary to Dr. Lambert's evaluation. (**Doc 6**)

6. Additionally, on **October 30, 2003** i submitted an evaluation from my Psychotherapist Dianne Glenn, who also stated that i had no psychotic features and that i have been compliant with all treatment recommendations, directly converse to Dr. Lambert's statement that i *"dropped out of treatment…"* and on **November 5, 2003** i obtained an evaluation from Dr. Sharon Lieteau,

Psychiatrist, who also stated that i "had no symptoms that would support a severe psychiatric illness...did not meet the diagnostic criteria for mood disturbance or psychotic disorders" and made no recommendations for medication. **(Doc 7 and Doc 8)**

7. Finally, on **March 30, 2004** i obtained an evaluation from Dr. Franchot B. Givens, Staff Psychiatrist with Community Mental Health Council, who confirmed the findings of the previous psychological professionals and further stated that "there is no need for further psychiatric follow-up".

8. After re-submitting this documentation several times at the request of Arne Duncan, CEO and Michael Scott, former Board President and constantly requesting supporting documentation of the allegations that prompted this Board Rule 4-54 Examination that has lead to my social, economical and professional degradation, i received letters from Wendy Haas and Ruth M. Moscovitch, former General Counsel dated December 13, 2004 and December 21, 2004, respectively. Employee Health Service Director, Haas states that, "With regards to your request for specific information regarding your administrator's rationale for their request for the 4-54 ... Examination, this information is ...never released in writing, per Board procedures." **(Doc. 9)**

9. Former General Counsel Moscovitch, stated that there needed to be a tie-breaker independent examination and offered $5,000 in settlement of all claims and formal resignation from Chicago Public Schools. She also states, "As promised, I have further investigated your situation and have enclosed the information we discussed." The information that i requested was copies of the specific written charges against me supporting the "opinions", "findings", and "conclusions of the principal, Boyd, Dr. Lambert and Haas, and for copies of specific citations of Board Rules and Policies stating that teachers can be placed on an immediate unpaid mandatory personal illness removal based on allegedly failing a Board Rule 4-54 Fitness for duty examination for a maximum period of two years. **(Doc. 10)**

10. The Procedures to be followed by an Administrator Requesting Fitness for Duty Examination states, "**Specific physical behavior and/or performance indicators demonstrated by the employee that cause the Administrator concern will be the reason to request a Fitness for Duty Examination... the principal ...shall substantiate the employee's behavioral performance...**" (Doc 11). Administrator Report for Fitness for Duty Examination provides for a Written Summary requesting the specific facts and circumstances about the employee's behavior and observations, including examples. **(Doc 12)**

11. Former Chief Labor Relations Officer, John Frantz, in a telephone conversation on December 13, 2004 verbally stated that "no one is privy to the confidential files stating the allegations leading to said medical lay-off , therefore [he] cannot tell specifically why [i] was sent for a psychological examination". Judicial Review of these unjust administrative decisions and procedures to determine whether the Board abided by its own procedures and rules was originally filed on **December 30, 2004 and is now pending Appeal**.

12. On **September 2, 2005**, in a meeting held pursuant to the directives of Michael Scott, it was agreed that i would obtain a fitness for duty examination from Dr. Sharon Lieteau whom i had been seeing on a regular basis, as every psychological professional that i talked to stated that while they could give an evaluation, they could not specifically state that a person was psychologically fit for duty based on one visit. The Board further agreed that **if** they did not agree with Dr. Lieteau's evaluation, they would require another opinion from a CPS selected psychological professional. It was made very clear at this time that i would not submit to an evaluation with Dr. Lambert or any of his affiliates at Mercy Works.

13. At this meeting, General Counsel, Patrick Rocks, indicated that it was his understanding that the leave should not end until February 2006 based on an existing Board Rule whereby a teacher can be placed on up to a 25-month mandatory leave. In a letter from myself to Michael Scott, dated **September 22, 2005**, stating that Sherri Thornton's unabashed prevarication that there is an existing Board Rule whereby a teacher can be placed on up to a 25- month mandatory leave for allegedly failing a Board Rule 4-54 Medical examination and the Law Department's lackadaisical approach to peacefully and expeditiously ending a grave travesty of justice for a notably outstanding pedagogical professional makes it apparent that there are those individuals in the Law Department who would rather continually misappropriate taxpayer dollars…needs to be rewritten just as the Board Rules have been willfully and wantonly rewritten. **(Doc. 13a – 13c)**

14. Also in the aforesaid letter, i expressed the necessity for the loophole in Board Rule 4-54 whereby a teacher can be sent for a psychological examination under the auspices of being sent for a medical examination based on the **unsubstantiated "opinion of a principal" and be immediately removed from their career for two years based on a one-time 40 minute interview with a Board appointed doctor, be investigated and corrected.** After filing a grievance with the Chicago Teachers Union on September 27, 2005, complaining of receiving a verbal notice of extension of the two year leave and requesting immediate placement in an interim position and return to the payroll pending disposition of being placed in a permanent position at least equivalent to the position that I held as an Appointed Teacher; in a letter dated December 22, 2005 to CTU President, Marilyn Stewart, from Arne Duncan, in response to said grievance, it came to my attention that rather than amicably correcting the loophole, the Board **REPEALED** Chapter IV and Adopted New Chapter IV Board Rules and **RESCINDED** Board Rules 2-19 and 2-27 and adopted new Board Rules. **(Doc. 14 -14b also see Doc. 15a &15b)**

15. According to Mr. Duncan's Response cited in **14b**, Board Rule 4-13 §'s (d) & (e) are amendments which clarifies Board Rule 4-33….that an involuntary personal illness leave shall have a duration of no more than twenty five work months…While Board Rules, apparently adopted **August 24, 2005;** according to the Agenda of Action Reports, states that the entire Chapter IV of the Board rules were Repealed. The difference being, repeal is a complete nullification of the rule, whereas an amendment suggests that there is an alteration in an already existing Rule. The Rule had to be abrogated because the provisions of the new rule present substantially contrary and irreconcilable conflict to the old rules, which according to Black's Law Dictionary 7th Ed., is more appropriately termed *"repeal by implication"*. **(See Doc. 15a & 15b; Examine Closely Docs. 16 thru 20, Relevant Board Rules Prior to September 2005 Repeal and Docs. 21 to 24a, Relevant Repealed Board Rules)**

16. Board Rule 4-13 formerly governed Military Leaves (Documents 18a & b); Board Rule 4-33 formerly governed Leave for Illness – Members of Teaching Force and stated in substantial part that a regularly appointed teacher…**must apply for and secure a leave of absence…The General Superintendent of Schools shall have authority, subject to the approval of the Board of Education, to grant a leave of absence… to an employee who shall file a written request thereof and present proof establishing personal illness**… **Upon presentation of proof establishing disability due to continued serious personal illness…the General Superintendent of Schools subject to the approval of the Board of Education, may extend a leave of absence granted for personal illness…not to exceed 25 school months as in the judgment of the General Superintendent of School is warranted**…. **(Docs 19a, b, & c);** Board Rule 4-54 **(Doc 20)**, formerly governed Fitness for Duty and merely stated that, If in the opinion of the Chief Executive Officer or his designee, any employee of the Chicago Public Schools…is physically

and/or mentally unfit to perform safely and/or efficiently his/her job duties, the Chief Executive Officer or his designee may require an appropriate health examination by a medical professional…Involuntary Personal Illness leaves were not addressed in the Repealed Board Rules, nor are they addressed in the teacher contract. Article 33-2 cited by Mr. Duncan simply states, "Personal illness leaves **may** be extended to a maximum of 25 school months for appointed teachers" and is stated as more of a privileged consideration than a reprimand.

17. Mr. Duncan and his designees would have the reader of this misfeasance believe that Board Rule 4-13 Involuntary Personal Illness Leaves – Fitness for Duty Leaves **(Doc. 24 & 24a)**; which replaces Board Rule 4-54, nullifies Rule 4-33 **(Doc 19 a, b, & c)**, and renders it necessary to rescind Board Rule 2-27 **(Doc. 17, former Rule; Doc. 22 Newly adopted rule)**; is merely a correction to an existing rule governing involuntary leaves that clarifies and required me to be on an extended leave; **rather than a rule eradicating** all prior relevant rules in an effort to justify an unjustifiable leave and extension via recalculation based on orchestrated malfeasance.

18. Grossly understated as unabashed prevarication and lackadaisicalness in my **Doc. 13b & 13c**, the collective actions of the City of Chicago Board of Education Law Department's aggressive and intentional misappropriation of taxpayer dollars to capriciously change the Board Rules as they existed September 2003, at the time of said leave, in a manner that recklessly disregards the rights of **all teachers**; more correctly exemplifies deceptive wanton practices that flagrantly violate Article I § 10 of the United States Constitution, which prohibits States from the exercise of ex post facto law. I AM SURE THE EXPOST FACTO CLAUSE APPLIES TO CITIES TOO! However, it appears that Chicago Public Schools are granted Immunity relative to the Constitutional, Statutory and Administrative due process for unjust actions perpetrated against teachers (ANYTHING GOES).

19. Instead of closing the loophole created by Board Rule 4-54 and writing Rules that specifically state the procedures for handling instances where a teacher allegedly fails such a fitness for duty examination such as the employee having the right to obtain a second opinion or protection under the Americans with Disabilities Act or protection under the Illinois School Code, as a two year mandatory unpaid personal illness leave is a reprimand that affects a pedagogical professional's career and livelihood; the Board has expanded its gross arrogance by implementing Board Rules that obviate their own Employee Discipline Code, State Law, Federal Labor laws, basic Constitutional and Human Rights, including the Americans with Disabilities Act; to possibly Dismiss an employee after placing an employee on an unsubstantiated, fraudulently obtained Fitness for Duty Examination for six months. **This is ludicrous and the time has come for an end to this madness that is destroying the lives of professionals. (Doc. 35 & 36)**

20. I was notified in a letter dated September 30, 2005 from General Counsel, Patrick Rocks to my attorney, that i would receive a letter at some future date advising me when said leave would end; that Dr. Lieteau's Fitness For Duty Examination consists of three sentences and does not provide an explanation of her opinion that I am fit to be a teacher and that a settlement which would include my resignation would result in a more "generous settlement". **(Doc. 25 & 25a)**

21. The Board's Chief Labor Relations Officer notified me verbally on Friday, September 23, 2005, the Friday before i was scheduled to return from a leave that has caused severe irrevocable economic, social and emotional harm to me and my family that the leave would end sometime in February and that i would receive notice of the exact date at a later time. In a letter dated October 12, 2005, i was given notice in writing that the current Leave of Absence was effective through February 22, 2006 and that a "re-evaluation" with the same Doctor and Institution that gave the

original fraudulent 40 minute evaluation was scheduled, notwithstanding our prior September 2, 2005 meeting. **(Doc. 26)**

22. Although Dr. Lieteau's evaluation was obtained per our agreement on September 2, 2005, is succinct and in accordance with the Code of Federal Regulations (CFR) Title 29, The Family and Medical Leave Act of 1993; on which the Board purports to rely for its policy relative to my return to work, i was not allowed to return to work; even though i received an evaluation from Dr. Franchot Givens on December 13, 2005 that supports Dr. Lieteau's explanation that I am fit for duty because I have no psychiatric diagnosis that would prevent me from fulfilling my responsibilities as a teacher **(Doc. 27, 27a & Docs. 28, 31, 32a, & 32b)**.

23. CFR Title 29 Section 825.310 ¶ (c) specifically states that a fitness-for-duty certification need only be a simple statement of an employee's ability to return to work ...**The employer may not delay the employee's return to work while contact with the health** care provider is being made; ¶ (e) states that, "Specific notice shall ...be given to any employee from whom fitness-for-duty certification (FFD) will be required either at the time notice of the need for leave is given or immediately after leave commences ... No second or third fitness-for-duty certification may be required." **(Doc. 31)**.

24. Disregarding relevant laws, including the Code of Federal Regulations, as well as, the American with disabilities ADA act, even though no notice has ever been given stating that a FFD exam would be required, the Board demanded another FFD certification without giving specific reasons for doing so; and without providing accommodations in accordance with the ADA, which states in substantial part that,... *no employer shall discriminate against a person with a physical or mental disability in regard to ...advancement, or discharge of employees and privileges of employment, including those being regarded as having such an impairment...; a reasonable accommodation shall be made for such individuals with disabilities that could include, job restructuring... reassignment to a vacant position...;* It further prohibits employers from requiring a medical examination ...unless such examination is shown to be job related... **(Docs. 32 C-1 thru 32 C- 4)**

25. Although my attorney responded promptly on October 14, 2005 to the Board's request for a settlement offer which included my resignation, and address their letter dated October 12, 2005 attempting to send me to Mercy Works, **(Doc. 29 & 29a)** the Board procrastinated a response until December 16, 2005, where, in their letter they provided the name and address of their chosen doctor, however they did not provide a date and time until December 20, 2005 **(Docs. 30 & 30a), approximately three months after I was scheduled to return to work.**

26. In a letter dated January 23, 2006, which the Board sent to my attorney via facsimile on January 26, 2006, they purport to propose a settlement agreement in which i would immediately be placed in the reassigned teacher's pool in exchange for settlement of all claims and disputes...it further requires that i dismiss all pending matters, including all claims, appeals, grievances and charges and provide global release to the Board and its officers...**(Doc. 33 & 33a)** This perfunctory offer is as outlandish as the one given on December 21, 2004 by the former General Counsel **(supra 9 & 10),** which sealed the complaint for Administrative Review as it constitutes a final decision of the Board's arbitrary and capricious action to place a tenured teacher on a mandatory unfit for duty personal illness leave without providing specific information regarding the rationale for the request and documenting that this information is never released in writing, per Board Rules.

27. From the inception of the Board's mendacious allegations that i am unfit to teach, i have assiduously sought employment within the Board outside of the area of teaching and have consistently been denied the opportunity to prosper in my chosen field of pedagogy and remain

hostage to a system that has caused me to lose my life inheritances, and every substantially valuable material possession; rendering me indebted for a vehicle repossession in the amount of $18,000.00 and causing irreparable damage to my creditworthiness due to foreclosure of a residential & commercial property valued in excess of $165,000.00 at the time of foreclosure... and is significantly impeding my upward socio-economic upward mobility **(Doc. 34)**

28. Notwithstanding the positive results of the over 5 hour evaluation conducted by Board selected Licensed Psychologist, Dr. Elizabeth H. Thompson on December 29, 2005, whereby, i was given an oral evaluation followed by a series of 5 written psychological tests totaling over 1500 questions; i have not been given any back pay nor was i placed immediately on the payroll pending being returned to a position equivalent to the Accounting position that was filched when i was wrongfully removed from my position in September 2003. I was required to interview for a position and now i am being told that i must remain in that position unless i can find a position on my own accord and that no one can place me in an Accounting position. Accounting & Banking & Finance positions are difficult to locate and are not usually advertised in the Bulletin. **(Docs. 37, 37a & 38)**

29. The Board's consistent insistence on using tax payer dollars to proceed with this injustice against a teacher who consented to returning to a position outside of their realm of normal experience and diligently worked to improve test scores at an Elementary School where 8th graders who had been without a teacher for several months were in serious jeopardy of not meeting the goals of the Illinois Standards Achievement Test (ISAT); **has become unbearably stressful**. Eighth Grade Mathematic scores increased from 9.8% to 53.5% of students meeting or exceeding goals in 2006 **(Docs. 39 & 40)**.

30. I am a teacher very proficient in my field of Accounting, Business & Mathematics, severely wounded by the injustices of bureaucracy, who has been forced into a self contained 7th grade position for which the Board has designated me as not being highly qualified to teach; i have no materials; no workbooks; no access to a copier; and special needs students without an instructor to provide adequate services. I have been given a remedial class without forewarning that the majority of the students are remedial and several are special needs. I have no training in teaching special needs students, nor am i trained to teach a two hour literacy block with no specifically developed curriculum in a class where the students are on 5 different learning levels. The position that i am in is tremendously distressful and is causing recurring physical health issues.

I, _____ do hereby affirm that the information contained herein, was written by me, and is true and correct chronological accounting of events preceding the Board Rule 4-54 Examination mandated on September 10, 2003.

Respectfully Submitted,

Affirmed and subscribed to before me this 5th day of January 2007

Queen A. Tiye Searles

_____
Notary public

Cc:  Et. al

# Booklet
# of
# Supporting
# Documents

CHICAGO PUBLIC SCHOOLS

Arne Duncan
Chief Executive Officer

September 10, 2003

Ms. Tina Allen                                                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
8205 S. Colfax                                                Teacher
Chicago, Illinois 60617

Dear Ms. Allen:

Based upon your work behavior as observed by Gwendolyn Boyd, Principal at
Marshall Metro High School, you are hereby directed to report to Mercy Works,
9050 W. 81st Street, Forest Med/Surg, Justice, Illinois, 60458 on Wedneday,
September 17, 2003 at 2:00 P.M. for a medical examination in accordance with
the rules of the Board of Education of the City of Chicago, Section 4-54, Health
Examination, which states:

> "If in the opinion of the Chief Executive Officer, or his designee,
> any employee of the Chicago Public Schools or the Chicago
> School Reform Board of Trustees is physically and/or mentally
> unfit to perform safely and/or efficiently his job duties, the Chief
> Executive Officer or his designee may require an appropriate
> health examination by a medical professional(s) selected by the
> Chief Executive Officer."

You are required to report for this scheduled medical examination with Dr.
Lambert on September 17, 2003. Failure to report to your scheduled
appointment, or to comply with Board Rule 4-54 is grounds for termination.

Gwendolyn Boyd has been notified of this appointment. She is authorized to
record you as "excused" so that you will suffer no salary loss.

If you have any questions, please contact the director of the Bureau of Employee
Health Services at (773) 553-1180.

Sincerely,

Arne Duncan

cc: Gwedolyn Boyd, Principal, Marshall Metro High School



(Doc. 1)

8205 S. Colfax
Chicago, Illinois 60617
September 16, 2003


Ms. Wendy Haas
Chicago Public Schools
125 S. Clark
Chicago, Illinois 60603

Greetings Ms. Hass;

Per our conversation on Friday September 12, 2003, I am requesting referral to a doctor located in the city of Chicago, preferably at the University of Chicago Medical Center. In my present condition of experiencing unpredictable episodes of dizziness and blackouts it would pose an undue hardship for me to travel long distances in unfamiliar territory alone.

Please reschedule the appointment scheduled for Dr. Lambert in Justice Illinois on Wednesday September 17, 2003 at your earliest convenience and contact me as soon as possible. Dr. Gwendolyn Boyd, principal of Marshall High School, has informed me that I am not to return to work until I have been seen by a Board of Education physician in accordance with the letter from Mr. Duncan's office dated September 10, 2003.

According to Dr. Boyd, the "work behavior" referred to in the letter from Mr. Duncan's office is related to current health issues that I am faced with and not my job performance. It is imperative to me that this distinction is unambiguous as it is my sincere desire to provide quality service to CPS and most importantly, to the students and parents I serve.

Sincerely,

*Queen Tiye Searles*

Queen Tíye Searles

Cc: Dr. G. Boyd
    Mr. Arne Duncan

(Doc. 2)

CHICAGO PUBLIC SCHOOLS

Arne Duncan
Chief Executive Officer

September 18, 2003

Ms. Tina Allen
8729 Commercial                                                          Teacher
Chicago, Illinois

Dear Ms. Allen:

Based upon your work behavior as observed by Gwendolyn Boyd, Principal at Marshall Metro High School, you are hereby directed to report for a medical examination in accordance with the rules of the Board of Education of the City of Chicago, Section 4-54, Health Examination, which states:

> "If in the opinion of the Chief Executive Officer, or his designee, any employee of the Chicago Public Schools or the Chicago School Reform Board of Trustees is physically and/or mentally unfit to perform safely and/or efficiently his job duties, the Chief Executive Officer or his designee may require an appropriate health examination by a medical professional(s) selected by the Chief Executive Officer."

An appointment has been scheduled for you with Dr. Thomas Lambert, Psychologist, on Friday, September 19, 2003, at 11:00 a.m. at the following location:

Mercy Hospital Doctor's Office Center
2525 South Michigan Avenue, 2nd Floor
Chicago, Illinois 60616
(312) 567-2013

You are required to report for this scheduled medical examination with Dr. Lambert on September 19, 2003. Failure to report for your scheduled appointment, or to comply with Board Rule 4-54, is grounds for termination.

Gwendolyn Boyd has been notified of this appointment. She is authorized to record you as "excused" so that you will suffer no salary loss.

If you have any questions, please contact the director of the Bureau of Employee Health Services at (773) 553-1180.

Sincerely,

Arne Duncan

cc:     Gwendolyn Boyd, Principal, Marshall Metro High School

(Doc 3)



**CHICAGO PUBLIC SCHOOLS**

Department of Human Resources · Bureau of Employee Health Services
125 South Clark Street, 2nd Floor · Chicago, IL 60603
Telephone 773/553-1180 · Fax 773/553-1181 · e-mail: EHS@csc.cps.k12.il.us
www.cps-humanresources.org

Wendy A. Haas, M.B.A., R.N.
Director

September 22, 2003

Ms. Queen Searles (Tina Allen)
8729 Commercial                                        Teacher
Chicago, Illinois 60617

Dear Ms. Searles (Tina Allen),

As you know, an evaluation of your fitness for duty status occurred on September 19, 2003. Dr. Tom Lambert, Psy.D., Clinical Psychologist, examined you on that date. Dr. Lambert issued his findings concluding that you should not return to work in your capacity as a Teacher. Accordingly, pursuant to Board policies and procedures, you are currently unfit to return to your duties as a Teacher. If you wish to present any medical evidence to contest Dr. Lambert findings, then such documentation may be sent to my attention at the above captioned address.

Based on the assessment of Dr. Lambert, the Chicago Board of Education is placing you on a medical leave of absence effective September 22, 2003. Your Personal Illness leave has been approved from September 22, 2003 through September 23, 2005. **Prior to your return to work, you will need to contact the Bureau of Employee Health Services.**

Do not hesitate in contacting the undersigned at 773-553-1180 if you have any questions in this matter.

Sincerely,

Wendy Haas
Director

∴    Gwendolyn Boyd, Principal, Marshall Metro High School

(Doc. 4)  12

**Tom Lambert Psy.D.**
Clinical Psychologist

525 S. Washington St.
Naperville, IL  60540

Phone 630-357-7035
Fax 630-428-9367

Sept. 23, 2003

Ms. Wendy Haas, Director
Dept. of Human Resources
Bureau of Employee Health Services
Chicago Public Schools
125 South Clark Street, 2nd Floor
Chicago, IL  60603

RE:  Queen A. Tiye Searles

Dear Ms. Haas,

I am writing regarding my fitness for duty evaluation of your employee, Ms. Queen A. Tiye
Searles on Friday Sept. 19.  Ms. Tiye Searles reported that she was removed from her teaching
responsibilities on Sept. 12. She was rather vague regarding specific circumstances relating to her
removal, however indicated that she had a problem with another instructor who left her no place
to sit down should she become dizzy. She reported that unless she was able to sit, she would pass
out, as happened to her on several occasions, including an incident in April, which precipitated her
being placed on leave. She stated that she was recently evaluated at  Bethany Hospital where she
was told that her condition is due to exhaustion and severe anxiety. She reported that recently she
has been getting some help from a psychotherapist, however due to her not having insurance and
having serious financial problems, she is not able to afford her sessions. She has not been under
psychiatric care and stated that she is opposed to use of any medications.

Ms. Tiye Searles reported that she has been under enormous stress since she lost her job with the
CPS in 1998.  She said that at that time she was "wrongfully" charged with "cruel and negligent"
treatment of another student who alleged that Ms. Tiye Searles humiliated her by confronting her
in front of the student body at an assembly.  Ms. Tiye Searles stated that she invested all of her
energy in contesting the allegations until she was able to have the charges expunged from her
record in 2001.  Due to significant financial and personal problems she attributed to her dismissal,
she lapsed into a severe depression.  She reported that her marriage fell apart and she filed for
divorce which was finalized in 2001. In addition, she was having problems with her teenage
daughter who ran away from home for approximately a year.  Ms. Tiye Searles recently gave up
custody to another family with whom her daughter was living.

Ms. Tiye Searles stated that she "pulled out of ..depression" after going to a "gospel fest" where
others prayed for her a couple of years ago. She also had her name changed in April from "Tina
Allen" which she did to "honor my ancestors." She indicated that she relies on prayer and herbal

(Doc 5)

supplements to help her manage her anxiety. She stated however, that she has very little social support other than two daughters and a granddaughter who currently live with her. She has recently felt more overwhelmed due to her being "wrongfully" evicted from her apartment. She reported that she was recently arrested and briefly incarcerated after her landlord called police, who charged her with criminal trespassing and resisting arrest. She stated that she has will be going to court on these charges in the next few weeks. She reported that she currently lives in a another building for which she was able to get financing and purchased.

On the mental status exam, Ms. Tiye Searles presented as alert, coherent and oriented to time place and person. She dressed in colorful attire, a bright yellow hat and a lime green scarf with which she covered most of her face. Significant anxiety was apparent with irritability, moderate psychomotor agitation and pressured speech. Her affect was labile. Her thinking was rather expansive and grandiose, with frequent references to religious themes. She shows limited insight with regard to her condition and is suspicious of other's intentions, vigilant to and preoccupied with perceived injustices. Her stream of thought was grossly intact. She denied any intention to directly harm herself or others, however she stated, "my landlord is on the verge of making me want to hurt someone...I will not put my hands on him...coals (from hell) will get him." She denied any history of violent behavior or suicide attempts. She produced a letter following her evaluation in which she reiterated that she has nothing to live for, but has no intention of harming herself or others, but wants desperately to have someone she can talk to about her problems.

On the basis of my evaluation, my opinion is that Ms. Tiye Searles is not currently fit to perform her duties as a teacher. Her presentation is consistent with a diagnosis of Major depression, severe, psychotic features and panic disorder. Based upon recent incidents, including her arrest, and a very limited social support system, there is some risk for her to act out aggressively either toward herself or others. She is in need of immediate psychiatric treatment. This may be problematic given her resistance to any kind of psychotropic medication (and reportedly having dropped out of treatment with a psychologist who suggested medication). Without intensive psychiatric treatment, it is highly unlikely that she would be able to function adequately in her position. She was however, clearly aware of the need for treatment and might be more receptive to the extent that she feels supported and has some expectation that her efforts to recover may enable her to return to work. Her return to work however, should be contingent upon compliance with treatment, including inpatient treatment if deemed appropriate by her psychiatrist.

I hope this information is helpful. Feel free to contact me if you have any further questions. Thank you for this referral.

Sincerely,

Tom Lambert, Psy.D.
Psychologist

(Doc. 5 cont'd)

## COMMUNITY MENTAL HEALTH COUNCIL, INC.
### CHICAGO, ILLINOIS 60617

### MEDICAL SERVICES

**Client Name:** queen tiye scarles    **ID#:**    **AGE: 46**

| Date | Start | End | Loc. | Svc. Code | R/C/CM |
|------|-------|-----|------|-----------|--------|
| 10/20/200? | 12:45 pm | 1:15 pm | 0 | 02 | C |

**Current Meds:** herbal supplements with B vitamins, flax seed oil omega 3 fish oil

**Chief symptom and reason for referral:** This 46 yr old AA female is on a medical leave from her teaching job following episodes of dizziness. In brief, Ms. Searles describes an incident in 1998 where she was accused of "cruelty" to a student. Ms. Searles states that she fought to have charges dropped and indeed, her record was expunged, taking over 4 years during which time she was not permitted to work. This patient states that upon return to the classroom, she felt "a little nervous and a little embarassed." She started experiencing dizzy episodes in the classroom and on the way to work. She passed out in April, she last worked in September. Ms. Searles states she is here for a fitness for duty evaluation. This patient does not recall accompanying symptoms during the dizzy episodes such as hyperventilation, parasthesias, nauseau, vomitting, diarrhee, palpitations, sweating, feeling of doom.

**History of present illness:** As above, dizzy spells were medically worked up and by report, nothing was found on exam. Pt denies accompanying symptoms consistent with panic d/o. Pt denies feelings of hopelessness, helplessness, worthlessness, or guilt. She denies SI/HI and denies psychotic symptoms. Sleep is wnl, patient admits to mild loss of appetite and weight secondary to her current "frustration." Pt denies anhedonia, anergia. Pt denies OCD symptoms. Pt denies any past psychiatric symptomatology. Pt denies dizzy spells since her removal from the classroom. Ms. Searles denies etoh and drug usage now or in past.

**Medical review of systems:** mild loss of appetite

**Past history:**
    Psychiatric: as above
    Medical: none known, LMP 3 wks PTA
    Neurological: LOC for 2 hours after dizzy spell in car
    Allergies: nkda

**Social History:** living with 3 children and grandchild, medical card, "medical leave" from teaching job(has taugth since 1988)

**Substance Use/Abuse History:** none

**Family medical history:** mom-unclear MI

**Mental Status Exam:**
Appearance: WNL ☒ Clean ☒ Neat/Tidy ☒ Dirty ☐ Disheveled/Unkempt ☐ Odorous ☐ Bizarre ☐
Interactions with clinician: pleasant, cooperative, well-related
Motor activity level and coordination: wnl
Tics, stereotypies, mannerisms: NO ☒ YES ☐
Mood: euthymic
Affect: WNL ☒ Flat ☐ Depressed ☐ Sad ☐ Elated ☐ Anxious ☐ Agitated ☐ Angry ☐ Labile ☐
Anxiety: NO ☒ YES ☐
Impulsivity: NO ☒ YES ☐
Compulsions: NO ☒ YES ☐
Obsessions: NO ☒ YES ☐
Aggression: NO ☒ YES ☐
Speech: WNL ☒ Soft ☐ Mumbling ☐ Loud ☐ Slurred ☐ Pressured/Fast ☐ Incoherent ☐


(Doc. 6)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Thought Process:** | WNL ☒ | Delusional ☐ | Circumstantial ☐ | Tangential ☐ | LOA ☐ | FOI ☐ | Illogical ☐ |
| **Thought Content:** | WNL ☒ | Paranoid/Suspicious ☐ | | Violent ☐ | | Grandiose ☐ | Sexualized ☐ |
| **Hallucinations:** | N/A ☐ | Denies ☒ | Auditory ☐ | Visual ☐ | Tactile ☐ Gustatory ☐ | | Olfactory ☐ |
| **Attention:** | WNL ☒ | Selective ☐ | Distractible ☐ | Heightened ☐ | | Refuses ☐ | |
| **Memory:** | WNL ☒ | | Recent: Good ☒ | | Fair ☐ | Poor ☐ | |
| | | | Remote: Good ☒ | | Fair ☐ | Poor ☐ | |
| **Clinical estimate of intelligence:** | | | Above Average ☒ | | Average ☐ | Below Average ☐ | |
| **Judgment and insight:** | | | Good ☒ | | Fair ☐ | Poor ☐ | |
| **Comments:** | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Suicide:** | ☒ Absent | ☐ Present | ☐ Ideation | **Homicide:** | ☒ Absent   ☐ Present |
| | ☐ Passive Thoughts of Death | ☐ Intent | ☐ Plan | | |

**Assessment:**    Patient presents with a history of dizzy spells, here for a fitness for duty evaluation

**Axis I:**  r/o adjustment disorder with anxious mood, r/o limited symptom panic d/o
**Axis II:**  deferred
**Axis III:** none known
**Axis IV:** Economic problems
**Axis V:**  70 - 75

**Plan:**  ☐ Pt informed of indications/benefits/risks/adverse effects of meds as per usual routine.

1. On exam today, this patient rules out for major depression, bipolar d/o, psychotic disorder, OCD. She may have a stress or anxiety disorder that may be recognized over time and treatment. By this patients report, therapy has been helpful in processing events in the past. She would like to continue therapy at CMHC and agrees to rtc for f-u psych evaluation with Dr. Givens (first availabl appt-Jan) Today, I have not prescribed any medication.

**Signature:** _____    **Staff ID #:** ___34___   **Date:** _1/21/02_

GAIL BASCH, M.D.
PSYCHIATRIST

(Doc. 6 cont'd)



October 30, 2003

DIANNE GLENN & ASSOCIATES INC.
THE WINDOW TO LIFE
525 E. 53RD ST. SUITE
CHICAGO, IL 60615

To Whom It May Concern:

Queen Tiye Searles, formerly known as Tina Allen, is a 46y/o African American female who is presently in therapy as a result of multi stressors related to her personal living status, financial status, medical status, and stressors related to her employment.

Client appears to be very intelligent even under stress and does not present any signs of suicidal or homicidal ideation or psychotic features. Client is very concerned regarding her work status.

Client has been motivated in therapy as she attempts to reduce her current stressors. Client has been compliant with all treatment recommendations. Client is expressing a desire to work and feels that she is able to perform her job responsibilities if allowed to resume work. I am hopeful that this information will be of assistance to you in resuming your employment responsibilities.

Sincerely,

Dianne Glenn
(Psychotherapist)

(Doc 7)



IANNE GLENN & ASSOCIATES INC.
HE WINDOW TO LIFE
525 E. 53RD ST. SUITE
HICAGO, IL 60615

To Whom It May Concern:

I evaluated Queen Tiye, formerly known as Tina Allen, on November 2, 2003.
The results of her evaluation are the following:

1). She had no symptoms that would support a severe psychiatric illness. She did not
meet the diagnostic criteria for mood disturbance or psychotic disorders, therefore there
were no recommendations for medication.

2). She did admit to some anxiety related to her current financial situation, and the
prospect of not being able to teach. The degree of anxiety was mild to moderate but had
not affected her ability to make rational judgments, and act appropriately.

Sincerely,

Sharon Lieteau, MD

11-05-03





**CHICAGO PUBLIC SCHOOLS**

Department of Human Resources · Bureau of Employee Health Services
125 South Clark Street, 2nd floor · Chicago, Illinois 60603
Telephone 773/553-1180 · FAX 773/553-1181 · e-mail: EHS@csc.cps.k12.il.us
www.cps-humanresources.org

Wendy A. Haas, M.B.A., R.N.
Director

December 13, 2004

Via US. Mail

Ms. Queen Searles
8729 South Commercial
Chicago, Illinois 60617

Dear Ms. Searles:

This letter is to confirm our conversation on the above captioned date.  Please be advised that you were placed on the maximum allowable period of personal illness leave, as a result of being found unfit for duty as a result of a medical examination pursuant to Board Rule 4-54.  In order to be considered for reinstatement to teaching duties at Chicago Public Schools, you must comply with an independent medical examination, from a provider of your choice of the enclosed physician panel list.  In addition, enclosed is the documentation from your former CTU attorney advising you of this required step for reinstatement, in March of 2004.

With regards to your request for specific information regarding your administrator's rationale for their request for the 4-54 Fitness for Duty Examination; as stated in our conversation, this information is not appropriately discussed over the telephone and is never released in writing, per Board procedures.

We discussed that Board procedure requires all employees who present documentation contrary to the original provider's recommendation, to comply with an independent medical examination, from a provider of your choice of the enclosed physician panel listed.  Therefore, if you wish to return to work you must consider this independent evaluation provided at no charge to you.

Please contact my office in writing regarding your decision to comply with an independent evaluation, including your decision on which provider you choose.  Any additional contact with Board offices regarding this matter is not productive in resolution of your case.  I suggest that you contact my office if you have further questions, as the Bureau of Employee Health Services is sanctioned to manage issues relating to employee Fitness for Duty Examinations.  I can be reached directly at (773) 553-1185.

Sincerely,

Wendy A. Haas

Encl. (2)

Cc: John Frantz, Chief Labor Relations Officer
    Ascencion Juarez, Chief Human Resources Officer
    Sunil Kumar, Assistant General Counsel

(Doc. 9)

LAW DEPARTMENT          Fax:773-5531702          Dec 23 '04    9:52    P.01



**Board of Education of the City of Chicago**
**Law Department**

Ruth M. Moscovitch
General Counsel

PLEASE RESPOND TO:
P.O. BOX 2878
CHICAGO, ILLINOIS 60690

125 South Clark Street
Suite 700
Chicago, Illinois 60603
Telephone 773/553-1700
FAX 773/553-1702

December 21, 2004

Ms. Queen Searles
P.O. Box 178523
Chicago, Illinois 60617-8523

Dear Ms. Searles:

I am glad we had an opportunity to meet in my office yesterday. As promised, I have further investigated your situation, and have enclosed the information we discussed.

The Board received, and considered, the medical documentation you submitted regarding your fitness for duty. However, these opinions conflict with the opinion of the Board's doctor. As a result, the Board needs an independent physician to give a "tie breaker" opinion, which the Board will accept. Board procedures require you to have a medical examination by one of the independent physicians on the attached list because this is the "tie breaker" opinion. You may choose from this list which doctor you wish to see. The Board has already vetted the credentials of these independent doctors, and is confident in their level of professionalism and knowledge in their field. Chicago Public Schools will pay the cost of this medical examination. Please advise me in writing whether you intend to comply with this requirement.

In the alternative, and in an effort to resolve all outstanding issues between yourself and the Board, I am offering you the sum of five thousand dollars ($5,000) in settlement of all of your claims. In exchange for the five thousand dollars, you will resign from the Chicago Public Schools and execute a standard settlement agreement. This offer is available for one week only.

(DOC. 10)

Please advise me in writing how you intend to proceed by Wednesday,
December 29, 2004.

Sincerely,

Ruth M. Moscovitch
General Counsel

Encl.

(Doc 10 cont'd)



## PROCEDURES TO BE FOLLOWED BY ADMINISTRATOR REQUESTING
## FITNESS FOR DUTY EXAMINATION

### Purpose

To determine whether an employee is physically and/or mentally fit to perform safely and/or efficiently his/her job duties.

### The Decision to Order a Fitness For Duty Examination

Specific physical behavior and/or performance indicators demonstrated by the employee that cause the Administrator concern regarding the ability of the employee to perform the essential functions of their job , will be the reason to request a Fitness for Duty Examination. **The fitness for duty evaluation is NOT a substitute for disciplinary action  per the Uniform Discipline code.**

Listed below, for easy reference, are some of the various types of behavior that might indicate that an employee is having behavioral or work performance difficulties.

- Major changes in physical health
- Difficulty in walking, standing, sitting, or bending
- Lack of coordination
- Change in/or unusual speech
- Inability to recognize people, places, or situations
- Attention span impaired
- Judgment errors not typical of past performance
- Work requires great effort
- Increased accidents on the job
- Issues of compromised safety of others or self

The principal, unit head or administrator shall substantiate the employee's behavioral performance and request a Fitness for Duty Examination. Employee Health Services (EHS) shall review the request, and the request will be discussed with the principal, unit head or administrator to determine if a Fitness for Duty Examination is warranted. If warranted, EHS will schedule the employee for a Fitness for Duty Examination at a nearby treatment facility.

### How to Initiate a Fitness for Duty Examination

Upon observing a problematic behavior, **immediately** contact EHS at 773-553-1179 and complete the 4-54 Request for Fitness for Duty Examination Form. Fax the completed 4-54 Request Form to EHS at **773-553-1181.** (This is a Secured Fax)

Page 9



(Doc. 11)



## ADMINISTRATOR REPORT FOR FITNESS FOR DUTY EXAMINATION
## (FORM 4-54)

- Call EHS at **773-553-1179** to discuss the immediate situation.
- Fax this form to EHS at **773-553-1181** (Secured Fax)

A Fitness for Duty Examination is requested for the following employee:

Name:_____ Social Security Number:_____

Position Number:_____ Job Title:_____

School/Work Location:_____

_____          _____
Principal/Unit Head Name                          Signature

_____          _____
Title                                                         Telephone Number

_____          _____
Date                                                         Time

### Written Summary

Please summarize the specific facts and circumstances about the employee's behavior and your observations, including examples (attach an additional sheet, if necessary).

_____

_____

_____

_____

(Doc. 12

P.O. Box 178523
Chicago, IL 60617
September 22, 2005


Michael Scott
President
Board of Education / City of Chicago
125 S. Clark Street
Chicago, Illinois 60603


Kind & Peaceful Greetings Mr. Scott:

This letter is in follow-up to a meeting held on September 2, 2005 pursuant your directives at the
August 24, 2005 Board meeting.  Present at said meeting were Board attorneys, Patrick Rocks,
General Counsel; Sherri Thornton, Associate General Counsel; my attorney, Deidre Baumann; and
myself, Queen A. Tíye Searles, f.k.a., Tína Allen.

This meeting was apparently an attempt to reach a settlement agreement and for the Board to show
Good Faith by immediately ending the two-year mandatory personal illness leave imposed on me in
September of 2003.  General Counsel suggested that a settlement including my resignation would
be the most expeditious way to resolve this matter and further indicated that it was his
understanding that the leave should not end until February 2006.  I have never received anything in
writing extending the imposed leave and further indicated to him that there is no where in Board
Rules, Policy or Procedures that a teacher a can be placed on a mandatory two year leave for
allegedly failing a Board Rule 4-54 Medical Examination.

In addition i expressed that the loophole existing whereby a teacher can be sent for a psychological
examination under the auspices of being sent for a medical examination based on the
unsubstantiated "opinion of a principal" and immediately removed from their career for two years
be investigated and corrected.  Upon inquiry from General Counsel, Sherri Thornton told Mr. Rocks
that:
* there is an existing Board Rule whereby a teacher can be placed on up to a 25-month mandatory
  leave but she did not know the exact rule.
* she did not know whether the Law Department could place a teacher returning from a
  mandatory two-year leave in an Interim Position
* she would discuss the matter with Human Resources and get back with Attorney Baumann
  before the end of the day to confirm the possibility of an Interim Position prior to the expiration
  of the leave scheduled to end on September 23, 2005.

To date the Law department has not contacted my attorney regarding an Interim Position and has
allowed the unprecedented mandatory two-year leave to remain through its duration.  Revisiting
relevant Board Rules listed as follows:

* **Sec. 4-10 Authorized Absence.**  An employee shall be granted full basic pay when the
  employee's absence is authorized, without loss of salary, by the General Superintendent of
  Schools or the general Counsel.
* **Sec. 4-33. Leave for Illness – Members of Teaching Force.**  In case of absence exceeding ten
  consecutive school days due to personal illness…employee must apply for and secure a leave of


(Doc 13a)

absence pursuant to the provisions of this section. The General Superintendent of Schools shall have authority, subject to the approval of the Board of Education to grant a leave of absence...to an employee who shall file a written request...present proof establishing personal illness...such leave shall not exceed ten school months...Upon presentation of proof establishing disability due to continued serious personal illness...longer than 10 months rendering return to duty impossible, the General Superintendent of Schools, subject to the approval of the Board of Education may extend a leave of absence granted for personal illness... for such additional period not to exceed 25 school months as in the judgment of the General Superintendent of Schools is warranted by all the circumstances...such personal illness...is subject to verification every five school months..

It is clear from the aforementioned Board Rules that an **approved leave is without loss of salary** and must come from the General Superintendent and that an **employee must apply** for a personal illness leave for up to 10 months and that an extension not to exceed 25 months must be applied for along with proof of serious illness and is subject to the approval of the General Superintendent of Schools and the Board.

The Attached Documents respectively Labeled A – G demonstrate as Follows:

- A - Apparently Wendy Haas, former Director of the Bureau of Employee Health Services requested and approved a two-year leave, whereas Board Rule 4-33 specifically establishes guidelines for extended leaves.
- B - Former General Counsel Marilyn F. Johnson was amiable to addressing issues as they arose regarding a prior settlement upon my request.
- C - This document from Associate General Counsel, Sherri Thornton which i retrieved from my personnel files addresses issues that were discussed during settlement negotiations and which i inquired about shortly after being appointed to Marshall, yet she never forwarded me this very important document which addresses "time in service" and vacation/sick leave accrued. It is my contention that Ms. Johnson may have handled this differently. Note that it was not copied to the General Counsel.
- D - I was an appointed teacher at the time of this removal, yet the Law Department according to Debra Harvey is planning to use as a defense that i am not a tenured teacher should future litigation become necessary.
- E - After just over one month with Marshall High School, i enthusiastically agreed to participate over the Summer and during the next school year in a Citigroup Foundation Grant Project provide in conjunction with American Educational Services
- F - I worked tenaciously to conceive a practical real life curriculum integrating Reading, Writing, English, Accounting, Mathematics, Technology, and Social Sciences; that would excite students and motivate learning beyond the classroom.
- G – I prepared students to participate in several summer employment programs, by providing opportunities for them to understand parliamentary procedures and leadership through having elected classroom officers; indoctrinating them with the knowledge, skills and attitudes necessary to qualify for prestigious positions in the Mayor's Chicago Summer Business Institute Program; rewarding outstanding classroom achievements by nominating excellent students for the distinction of Student of the Month; and by writing letters of recommendation for students attaining subject matter proficiency.

Prior communication from Associate General Counsel Sherri Thornton, coupled with her unabashed prevarication to General Counsel Patrick Rocks that there is an existing Board Rule whereby a


(Doc 136)

teacher can be placed on up to a 25-month mandatory leave for allegedly failing a Board Rule 4-54 Medical examination, as well as, the Law Departments lackadaisical approach to peacefully and expeditiously ending a grave travesty of justice for a notably outstanding pedagogical professional and upstanding citizen; makes it apparent that there are those individuals in the Law Department who would rather continually misappropriate taxpayer dollars than to take a prima facie look at Board Rules, Policies and Procedures as they are clearly written and advise the Board, CEO, Department Heads, and/or Principals at the onset of an occurrence in violation of Board Rules, Policies and Procedures thereby avoiding unnecessary excessive litigation expenses.

Said leave, which continues to cause irreparable harm, is scheduled to end today, however, notwithstanding that my attorney Deidre Baumann has submitted a copy of my doctor's Fitness for duty statement that i can return to work at anytime and that I personally submitted said statement to Labor Relations i have not been informed as to how my return to work should ensue, nor if i should return on Monday September 26, 2005. The gross indifference as to the circumstances my family and i are suffering in the prolongation of unjust atrocities constitute intentional infliction of emotional distress and interference with economic advantage as we have suffered and continue to endure substantial loss of property interests.

As i unequivocally stated to The General and Associate General Counsels for the Board, i am proud of the amelioration that your administration continues to implement and the way that you advocate for teachers in public forums and unless the Board specifically request my resignation, i will not consider being forced to resign from a system that is responsible for my accomplishments and a profession wherein lies one of my life-long passions. I revere the pedagogical professionals of the Chicago Public Schools who embraced me as a ward of the state and provided parenting for me as well as instilled in me the knowledge and wisdom to succeed. Just as for you, in your volunteer position as Board President, pedagogy is more than just a pay check. For me it is a way of life everlasting.

Respectfully Submitted,

*Queen A. Tiye Searles*

Queen A. Tiye Searles
773 412-6595
Enclosures
Cc    Arne Duncan
       Patrick Rocks
       Sherri Thornton
       Mayor Daley
       Sandra Cardenas
       Deidre Baumann
       Et. al


P.S. I am grateful to know that at least 12 of your family members have survived Katrina we are also Blessed that two of ours are here in Chicago. You and your family are in my prayers.

(Doc. 13c)

P. O. Box 178523
Chicago, IL 60617
September 27, 2005

Marilyn Stewart
President
Chicago Teachers Union
222 Merchandise Mart Plaza Ste. 400
Chicago, Illinois 606054-1016

Kind & Peaceful Greetings Ms. Stewart:

This correspondence is requesting the CTU to file an official and formal grievance in accordance
with §§ 3-7.1 & 3-7.3, of the Agreement Between the Board of Education of the City of Chicago
(Board) and Chicago Teachers Union Local 1 American Federation of Teachers AFL-CIO, based on
gross violation of §§ 33-3, 33-13, & 33-15 of said agreement by the Board. On September 22, 2003
Wendy Haas, former Director of Employee Health Services, forwarded the attached letter approving
an unprecedented personal illness leave effective September 22, 2003 through September 23, 2005.
Although said unjust leave was specifically scheduled two years ago to end on last Friday,
September 23, 2005 and not withstanding that medical documentation was submitted stating that i
am fit to return to duty at any time (see document B), Rachel Resnick, Chief Labor Relations
Officer for the Board informed me on Friday via telecommunications that the leave was extended
until February 2005 by the Board's law department. To date, this extension which was not
requested by me nor supported by the required medical documentation demonstrating serious illness
making it impossible for me to return to work, has not been given to me in writing.

Extending said leave is in violation of Board Rule 4-33, as well as the Teacher Agreement. Please
address this grievance most expeditiously. Pursuant to a conversation with Jerald Siegel and Nick
Cannella, enclosed is a copy of a settlement agreement from former CTU General Counsel Kathrin
Koenig and First Assistant General Counsel Mildred Haggerty and my counter proposed settlement
agreement as requested. It is perplexing that these pertinent documents were not in the CTU files.

My further request is that the CTU demand that i be immediately placed in an interim position and
returned to the payroll pending disposition of being placed in a permanent position at least
equivalent to the position that i held as an Appointed Teacher (see Document C) at the time of the
unprecedented mandatory two-year psychologically unfit to teach personal-illness leave unduly
imposed without the written approval of the Board or CEO.

Please contact me within three business days of your receipt of this letter to inform me as to how the
Union will respond to the aforementioned grievance. You can reach me at (773) 412-6595 and/or at
the above address. Your kind assistance in the matter of my return to work is sincerely appreciated.

Respectfully Submitted,


Queen Tiye Searles

Cc:     Nick Cannella
        Jerald Siegel
        Et al.





**CHICAGO PUBLIC SCHOOLS**

Arne Duncan
Chief Executive Officer

December 22, 2005

Marilyn Stewart
President
Chicago Teachers Union
222 Merchandise Mart Plaza
Suite 400
Chicago, Illinois 60654-1005

Re:  Queen Searles
#05-10-105 (jas)

Dear Ms. Stewart:

Pursuant to the provisions of Article 3-3 of the *2003-2007 Agreement between the Board of Education of the City of Chicago and the Chicago Teachers Union*, a conference was held on December 15, 2005 concerning this grievance. The grievance was filed on October 17, 2005, and was denied at the lower level. Present were Jerald Siegel, field representative, Chicago Teachers Union; Queen Searles, teacher on leave from Marshall Metro High School; and Tom Krieger, hearing officer, Office of Labor and Employee Relations. Present as observers were Mark Ochoa, financial secretary, Chicago Teachers Union; Deidre Baumann, attorney for Ms. Searles; and John Harbin, fiancé of Ms. Searles.

Alleged Violations: Articles 3, 33-13, 36 and Board Rule 4-33. The grievant alleges that her involuntary medical leave was improperly extended by the Board. The grievant was placed on an involuntary medical leave on September 23, 2003, after a fitness for duty examination which was conducted by a clinical psychologist, Dr. Thomas Lambert. The grievant alleges that when she first received notification that she had been placed on the leave, it was scheduled to end on September 23, 2005. The grievant claims that the end date for her leave was subsequently changed by the Board to a date in February, 2006. The grievant claims that a letter dated September 17, 2005 from her psychiatrist, Dr. Sharon Lieteau, states the grievant was fit for duty as of September 17, 2005.

The grievant argues that her leave was extended in violation of former Board Rule 4-33 because, she claims, the rule requires that a health examination be performed before an involuntary leave can be extended. The grievant also claims that Article 33-13 of the collective bargaining agreement was violated. Article 33-13 states:

> In an absence exceeding 10 consecutive days due to a personal illness, a full-time appointed teacher shall apply for and secure a personal illness leave of absence. Such leave shall not exceed ten school months nor be in excess of a total of ten school months in any 2 consecutive school years. The teacher's position shall be held open for 10 school months or to the end of the semester immediately following said 10 school months upon the written request of the teacher for such extension at least two weeks before the leave expires.

> Thereafter, the position shall be declared vacant, but the teacher, upon reporting for duty at the expiration of such extended leave, shall be eligible for immediate assignment, and if not placed in an assignment, shall be placed in the reassigned teacher pool.

> A teacher who uses his/her accumulated sick leave for the entire period of personal illness leave shall have his/her position held open.

OFFICE OF THE CHIEF EXECUTIVE OFFICER · 125 SOUTH CLARK STREET, 5TH FL. · CHICAGO, ILLINOIS 60603 · TELEPHONE 773/553-1550 · FAX: 773/553-1502

SCANNED DEC 2 3 2005

(Doc. 14a)

Based on the foregoing, the grievant claims she should be reinstated to her position retroactive to September 23, 2005 and receive all salary and benefits she would have received as of that date.

Response: Board Rule 4-13 Sections (d) and (e) as amended in September, 2005, which clarified Board Rule 4-33 and ensured that it was consistent with the Chicago Teachers' Union collective bargaining agreement, directly address the issue of an extension of an involuntary personal illness leave. Consistent with Article 33-2 of the collective bargaining agreement, Board Rule 4-13 (d) clarifies that an involuntary personal illness leave shall have a duration of no more than twenty five (25) work months; and 4-13 (e) states that an involuntary personal illness leave shall terminate on the earlier of: 1) certification that the employee is fit for duty by an appropriate health care professional approved by the Chief Executive Officer, or 2) the expiration of twenty five (25) work months.  The grievant's leave was accurately calculated to expire after twenty five (25) work months, or February 22, 2006, as allowed by Board Rule 4-13.  The original end date of September 23, 2005 evidently was calculated on calendar months rather than work months.  Thus there was no "extension" of the leave in September 2005.  Instead, the leave was recalculated using work months rather than calendar months as required by both Board Rule 4-13 and the collective bargaining agreement.

Furthermore, on September 2, 2005 during a meeting with attorneys from the Board's Law Department, the grievant and her attorney agreed that the grievant would forward a letter from a psychiatrist or psychologist stating the opinion that the grievant was fit to resume duties as a teacher.  If Chicago Public Schools personnel did not agree with the opinion, they would schedule the grievant for an evaluation by a psychiatrist or psychologist selected by the Chicago Public Schools.  On or around September 17, 2005 the grievant submitted a return to work letter from a psychiatrist.  The letter, however, did not provide a basis for the opinion that the grievant was fit to return to duty.  On October 12, 2005, the Board's Office of Employee Health Services notified the grievant that she was scheduled for an evaluation by a Board selected psychiatrist or psychologist on October 19, 2005.  Counsel for the grievant advised the Board on October 14, 2005 that the grievant would not appear for this examination because she objected to the Board's vendor, Mercy Works.  The Board then retained a new vendor to complete the Board's evaluation of the grievant.  That evaluation is scheduled for December 29, 2005.  Depending on the outcome of the evaluation, the grievant and the Board may need to identify a neutral evaluator to serve as a tie-breaker.

Accordingly, the grievant's involuntary personal medical leave was appropriately determined to expire on February 22, 2006, a period of twenty five (25) work months, as allowed by Board Rule 4-13 (e).

Decision:  There has been no contract, Board Rule or policy violation in this matter.  The grievance is denied.

Please contact Tom Krieger at 773-553-1193 if you have any questions regarding this correspondence.

Sincerely,

Arne Duncan

AD:CJC:tak

cc:    Queen Searles
       Sharon Tiller
       Deidre Baumann

(Doc. 14b)

# CHICAGO PUBLIC SCHOOLS

Student   Parent   Community   Schools   Instruction   About CPS

## 2005 Board Action

**Select a Topic**

Board of Education
Board Agenda
Board Actions
Board Meetings
Board Rules
Board Policy Site

Agenda of Action - August 24, 2005 Board Meeting. Download the complete 317 page
Action here **(15 MB)**

## NON-DELEGABLE BOARD REPORTS THAT REQUIRE MEMBER ACTION

### MOTION

| | | |
|---|---|---|
| 05-0824-MO1 | Motion to Close | *Adopted |

### REPORTS FROM THE GENERAL COUNSEL

| | | |
|---|---|---|
| 05-0824-AR2 | Workers' Compensation – Payment for Lump Sum Settlement for Robert Porembo, Case # 03 WC 54714 | *Adopted |
| 05-0824-AR3 | Workers' Compensation – Payment for Lump Sum Settlement for Janis Simonic, Case # 02 WC 27557 | *Adopted |
| 05-0824-AR4 | Workers' Compensation – Payment of Arbitration Award Lene Washington, Case # 99 WC 54960 | *Adopted |
| 05-0824-AR5 | Workers' Compensation – Payment of Arbitration Award Essie Lee Wright, Case # 00 WC 18236 | *Adopted |
| 05-0824-AR6 | Approve Settlement Recommendation for Linda Ross-Hutchinson, Principal Assigned | *Adopted |
| 05-0824-AR7 | Approve Settlement Agreement with Xcel Energy Performance Contracting Inc. | *Adopted |
| 05-0824-AR8 | Authorization to Pay Attorney Fees, Appraisal Fees and Costs Relating to the Abandonment of Eminent Domain Proceedings to Acquire 201 – 209 West 103rd Street, Chicago, Illinois | *Adopted |

### REPORTS FROM THE CHIEF EXECUTIVE OFFICER

| | | |
|---|---|---|
| 05-0824-EX2 | Principal Contracts (A) (Bickham; Kukielka; Miller; Watson) | *Adopted |
| 05-0824-EX3 | Principal Contract (B) (Tweedie) | *Adopted |
| 05-0824-EX4 | Appoint Manager Office of Business Diversity (Nadia M. Quarles, Esq.) | *Adopted |
| 05-0824-EX5 | Warning Resolution – Charles Gunn, Teacher, Assigned to Washington Irving Elementary School | *Adopted |
| 05-0824-EX6 | Warning Resolution – Richard Martin, Teacher, Assigned to Prosser High School | *Adopted |
| 05-0824-EX7 | Request for Dismissal of Margaret Pouska, Director, Northside College Preparatory High School | *Adopted |

(Doc. 15a)

| | P05 Adopt an Amended and Restated Chicago Public High Schools Athletic Association Constitution and Bylaws | |
|---|---|---|
| 05-0824-PO2 | Amend Board Report 01-1128-PO2 Integrated Pest Management Policy | Withdrawn |
| 05-0824-PO3 | Amend Board Report 04-0526-PO2 Adopt a New Comprehensive Policy on the Enrollment and Transfer of Students in the Chicago Public Schools | *Adopted |
| 05-0824-PO4 | Adopt New Supplemental Family and Medical Leave Policy | *Adopted |
| 05-0824-PO5 | Adopt On-Loan Leaves of Absence with Pay for Employment in a Contract School Policy | *Adopted |
| 05-0824-PO6 | Adopt On-Loan Leaves of Absence with Pay for Employment at a University or Educational Institution Policy | *Adopted |
| 05-0824-PO7 | Adopt Sabbatical Leave Policy | *Adopted |
| 05-0824-PO8 | Adopt Compensation and Pay Plan Policy | *Adopted |
| 05-0824-PO9 | Adopt Appointment and Assignment of Teachers and Principals Policy | *Adopted |
| 05-0824-PO10 | Adopt Employees' Sick, Personal and Vacation Benefit Days Policy | *Adopted |

**BOARD RULES**

| 05-0824-RU1 | Repeal Chapter IV of the Board Rules and Adopt New Chapter IV Board Rules | *Adopted |
|---|---|---|
| 05-0824-RU2 | Rescind Board Rule 2-19 Annual Adoption of Rules and Rescind Board Rule 2-27 Delegation of Board Authority and Adopt New Board Rules 2-19 and 2-27 | *Adopted |

**COMMUNICATIONS**

| 05-0824-CO1 | Communication Re: Approve the Participation of Infinity Math/Science Tech High School in an Educational Tour to George Williams Camp Site, Lake Geneva, Wisconsin And Authorize Expenses Related to the Program (05-0824-ED15) | *----------- |
|---|---|---|
| 05-0824-ED15 | Approve the Participation of Infinity Math/Science Tech High School in an Educational Tour to George Williams Camp Site, Lake Geneva, Wisconsin and Authorize Expenses Related to the Program | *Adopted |
| 05-0824-CO2 | Communication Re: Location of Board Meeting of September 28, 2005 125 South Clark Street – Board Chamber | *----------- |

**REPORTS FROM THE CHIEF EXECUTIVE OFFICER**

| 05-0824-EX1 | Transfer of Funds | Adopted |
|---|---|---|

**REPORTS FROM THE CHIEF EDUCATION OFFICER**



A.    Roll Call
B.    Closed Session
C.    Closed Session Items
D.    Reading and Consideration of Minutes
E.    Unfinished Business
F.    Resolutions
G.    Policies
H.    Board Rules
I.    Communications
J.    Non-Delegable Reports
   1.    Board Office; General Counsel; Inspector General
   2.    Chief Executive Officer
   3.    Chief Management Officers
   4.    General Counsel
K.    Delegable Reports
   1.    Chief Executive Officer
   2.    Chief Management Officers
   3.    General Counsel
L.    New Business
M.    Adjournment

(Amended 10-31-73; 07-23-80; 01-27-82; 11-08-90; 03-26-93; 03-23-94; 10-25-95; 01-24-96; 02-23-00; 09-26-01)

**Sec. 2-17.   Rules of Order.**   The Rules of Parliamentary Practice embraced in the most recent edition of Robert's Rules of Order shall govern the Board of Education in all cases in which they are not inconsistent with the Rules of the Board of Education. (Amended 12-16-81)

**Sec. 2-18.   Amendment and Suspension of Rules.**   The Rules of the Board of Education may be repealed, amended or added to only at a regular meeting and by a vote of two-thirds of the full membership.   Any and all amendments to these Rules shall specify therein the chapter and section thereof sought to be amended.

The Rules may be suspended at any regular meeting by a majority of the full membership then serving; provided, however, that these Rules shall not be suspended for the purpose of repealing, amending, or adding to the same except by a vote of two-thirds of the full membership.

**Sec. 2-19.   Readoption of Rules. (Suspended 07-26-95)**   At the annual meeting of the Board of Education, the Secretary shall present to the Board of Education for readoption the Rules, by-laws, and regulations then in force, and such Rules, by-laws and regulations shall be re-enacted by a majority vote of the full membership.

11

(Doc.16  )

### Sec. 2-27.  Delegation of Board Authority.

a.    Pursuant to Public Acts 86-0124 and 89-15, the Board hereby delegates to the Chief Executive Officer, the Chief Operating Officer, the Chief Education Officer, the Chief Purchasing Officer, the Chief Financial Officer and the General Counsel, the authority to act regarding those matters over which they have charge and control, with the following exceptions.

1)    Budget approval obligations;

2)    Rule-making functions;

3)    Desegregation obligations;

4)    Real Estate acquisitions or sales;

5)    Real Property leases in excess of 10 years;

6)    Tax levies;

7)    Mandates imposed upon the Board by "An Act in Relation to School Reform..." (P.A. 86-1477);

8)    Personnel actions outlined in Section 4-49 of these Board Rules; and

9)    Dismissal of tenured teachers, principals and regularly appointed personnel whose appointments have become permanent, and teacher warning resolutions (Dismissals of tenured teachers and principals shall be made pursuant to Section 34-85 of the Illinois School Code.

b.    Decisions made by the above stated officers shall be submitted to the Board in the form of Board Reports which shall disclose any and all relevant information, and all such decisions shall not be legally effective until the Board approves such action; except, however, the Board hereby delegates to the following officers the authority to perform the specific duties stated below in addition to any other duties so delegated within these Rules, without submitting Board Reports and without Board approval:

1)    The Chief Executive Officer has the authority to authorize and execute any and all intergovernmental agreements and other miscellaneous types of agreements that have no financial impact on the Board, subject to approval as to legal form by the General Counsel.

2)    The Chief Operating Officer has the authority to authorize and execute any and all real property leases/licenses where the Board is the landlord/licensor, with a term less than 10 years, regardless of the dollar amount, subject to approval as to legal form by the General Counsel (except for leases/licenses at 125 S. Clark Street, Chicago, Illinois, which require prior Board approval); and has the authority to authorize and execute all real property leases/licenses where the Board is the tenant/licensee, with a term less than 10 years, and the dollar amount of the lease/license is $75,000 or under for the term of the



Any amount in excess of the Contribution or below the minimum Contribution amount that would be payable under Section 4-8.1 shall be paid directly to the eligible full-time employee at the time of separation. (Adopted 05-26-04)

**Sec. 4-9. Court Attendance.**   An employee shall be granted full basic pay when the employee's absence is due to required attendance in court, or other judicial proceedings, in connection with litigation in which school interests or records are involved, or when the State of Illinois, the City of Chicago, or the Board of Education of the City of Chicago is a party and the employee is not personally interested in the outcome of the litigation a part from his or her interest as an employee of the Board.   When the employee is subpoenaed as a witness within Cook County, Illinois, in cases where the employee is not personally interested in the outcome of the litigation, the employee shall be granted full basic pay less an amount equal to the statutory subpoena fee. (Amended 07-31-91; 09-24-03)

**Sec. 4-10.   Authorized Absence.**   An employee shall be granted full basic pay when the employee's absence is authorized, without loss of salary, by the General Superintendent of Schools or the General Counsel.   (Amended 03-24-82; 07-31-91; 09-23-98)

**Sec. 4-11.   Leave of Absence - Educational Support Personnel.**   Any regularly appointed educational support personnel who has been in such service of the Chicago Public Schools for not less than three months, may be granted leave of absence without pay by the General Superintendent of Schools or the General Counsel. (Amended 03-28-79; 03-24-82; 07-31-91; 10-25-95; 02-23-00)

**Sec. 4-12.   Reinstatement After Leave of Absence - Educational Support Personnel.** Upon the expiration of a leave of absence, educational support personnel shall be reinstated to any vacancy for which the individual is selected by the Principal or Unit head.   In the absence of the Principal selecting the employee for a vacancy such educational support personnel shall be laid off and placed on an appropriate eligibility list. (Amended 03-28-79; 03-24-82; 07-31-91; 10-25-95; 09-23-98)

**Sec. 4-13.   Military Leave - Officers and Educational Support Personnel.**   Any officer or educational support personnel of the Chicago Public Schools, other than a temporary officer or employee, who is inducted or enlists in the Armed Forces of the United States or who, whether or not voluntarily, enters upon active duty in the Armed Forces of the United States shall be placed on military leave during the period of such military service. The officer's or educational support personnel's position or a comparable position shall be held open without prejudice during said period of military service, plus 90 days.   Such officer or educational support personnel who shall have received a


(Dec. 18 a)

discharge other than dishonorable from such military service, and who makes application for reassignment to the individual's position with the Chicago Public Schools within 90 days after the officer's or educational support personnel's discharge from such military service and who shall pass a health examination given by a medical examiner in a manner prescribed by the General Superintendent of Schools, shall be restored to the officer's or educational support personnel position they would have been entitled had the officer or educational support personnel been continuously employed by the Chicago Public Schools during the period of the military leave. In the event that the employee does not pass such health examination and within ten days from the notice of such failure makes written request to the General Superintendent of Schools for additional medical opinion, the General Superintendent of Schools shall select another medical examiner acceptable to both the employee's personal physician and to the General Superintendent of Schools. If the medical opinions are in disagreement, a third medical examiner shall be selected in the same manner, and a majority opinion of such health examiners shall be final; provided, however, that any officer or educational support personnel who fails to pass such health examination in the majority opinion of the health examiners, may appeal to the Chicago Public Schools for a review of the decision and final determination. (Amended 07-31-91; 02-26-92; 10-25-95)

Section 4-13 is applicable only to those who enlist and only if the total of such person's service performed between June 24, 1948, and August 1, 1961, did not exceed four years, and the total of any service, additional or otherwise, performed by such person after August 1, 1961, does not exceed five years, and if service in excess of four years after August 1, 1961, is at the request and for the convenience of the federal government (plus in each case any period of additional service imposed pursuant to law). It is further provided that Section 4-13 is applicable only to those who voluntarily enter active duty and only if the total of such active duty, performed between June 24, 1948, and August 1, 1961, did not exceed four years, and the total of any such active duty, additional or otherwise, performed after August 1, 1961, does not exceed four years (plus in each case any additional period in which such person was unable to obtain orders relieving such person from active duty). (Amended 05-23-84; 07-31-91)

**Sec. 4-14. Engineer-Custodian. (Repealed 10-25-95)**

**Sec. 4-15. Eligibility List of Teachers. (Repealed 02-24-99)**

**Sec. 4-16. Certificates to Teach. (Repealed 07-31-91)**

(Doc. 18 b)

A leave granted under the provision of this Rule for a period of one school or calendar year shall be a bar to any further application for leave hereunder until after the completion of at least four years additional continuous satisfactory active service. (Amended 10-27-98)

**Sec. 4-32.    Leave to Attend Conferences.**    The General Superintendent of Schools shall have authority to grant to a full-time employee leave to attend without loss of salary professionally-related conferences, meetings, workshops, or conventions, which in the judgment of the General Superintendent of Schools are beneficial or related to the work of the schools, or commencement exercises at which a degree is being conferred upon the employee. The General Counsel shall have the same authority with regard to career service employees in the Law Department. (Amended 09-25-68; 03-24-82; 07-31-91; 09-23-98; 02-23-00)



**Sec. 4-33.  Leave for Illness - Members of Teaching Force.**  In case of absence exceeding ten consecutive school days due to personal illness, including pregnancy-related disability, a full-time principal, regularly appointed teacher, or other regularly certificated person, (hereinafter collectively referred to as "employee") must apply for and secure a leave of absence pursuant to the provisions of this section.   The General Superintendent of Schools shall have authority, subject to the approval of the Board of Education, to grant a leave of absence (without pay except as provided in the "sick pay" Rule) to an employee who shall file a written request thereof, and present proof establishing personal illness, in which case the position shall be held open as indicated below. Except as hereinafter provided, such leave shall not exceed ten school months in any school year nor be in excess of a total of ten school months in any two consecutive school years.   Upon presentation of proof establishing disability due to continued serious personal illness, including pregnancy-related disability, longer than said 10 months, rendering return to duty impossible, the General Superintendent of Schools, subject to the approval of the Board of Education, may extend a leave of absence granted for personal illness, including pregnancy-related disability, for such additional period not to exceed 25 school months, as in the judgment of the General Superintendent of Schools is warranted by all the circumstances, provided that the rights of the employee to his or her former position are terminated, and that such personal illness, including pregnancy-related disability, is subject to verification every five school months. Failure to provide the General Superintendent of Schools with said verification within ten school days after each five school months will result in the termination of the leave. (Amended 11-20-85; 07-31-91)

The employee's position shall be held open for a period of ten school months; thereafter the position shall be declared vacant. A principal or other regularly certificated person reporting for duty at the expiration of such an extended leave shall have the person's name placed on the appropriate teacher



and/or principal eligibility list.  Notwithstanding any provision in this or any other Board Rule to the contrary, the position of the principal shall be held open only for the duration of time remaining on the principal's performance contract. The employment of the principal and the right to all emoluments related thereto shall terminate on the expiration of the performance contract. A regularly appointed teacher upon reporting for duty at the expiration of such extended leave, shall report to the Bureau of Teacher Personnel, Chicago Public Schools, and said Bureau shall immediately provide the regularly appointed teacher with a list of all vacant positions for which the teacher is qualified and where the teacher further enhances or maintains the achievement of the goals of the Plan to Implement the Provisions of Title VI of the Civil Rights Act of 1964, and which as a result of the individual's selection will assure that the racial composition, experience, and educational training of the school selected will more nearly approach the systemwide proportions.  (Amended 07-31-91)

Within ten working days of reporting for duty, the regularly appointed teacher shall make a written application to at least three vacant positions from the list provided by the Bureau of Teacher Personnel.  The applications shall be made to the principals and a copy of each shall be provided by the teacher to the Bureau of Teacher Personnel.  (Amended 07-31-91)

The regularly appointed teacher shall be interviewed by the principals to whom the teacher submitted written applications.  (Amended 07-31-91)

When a principal makes a written recommendation to the Bureau of Teacher personnel of the teacher's selection to a specific position, the regularly appointed teacher shall be appointed to said vacant position.  (Amended 07-31-91)

If no vacancy exists in the regularly appointed teacher's certificate area of if said teacher receives written rejections by three principals, the Chicago Public Schools shall assign the regularly appointed teacher to a full-time teaching position according to the teacher's certificate area and in compliance with the provisions of the Plan to Implement the Provisions of Title VI of the Civil Rights Act of 1964.  Copies of all written rejections shall be submitted by the principals to the Bureau of Teacher Personnel.  The regularly appointed teacher shall be required to make a written application for assignment to a true vacancy for which the teacher is qualified and which enhances the racial, experiential, and educational compositions, prior to the end of the school year for the next school year and shall follow the same process as set forth in this Rule.  A regularly appointed teacher may also, upon the teacher's reinstatement from a leave for illness exceeding ten school months, place the teacher's name at the top of the transfer list to return to the teacher's former school if the teacher so desires.  (Amended 07-31-91)


(Doc. 19 b)

Any employee who is granted an extension of leave of more than five school months as herein provided for, shall be required to pass a health examination by a medical examiner in a manner prescribed by the General Superintendent of Schools before return to duty. If the employee does not pass such examination, and within ten days from the notice of such failure, makes written request to the General Superintendent of Schools shall select another medical examiner acceptable to both the employee's personal physician and to the General Superintendent of Schools. If the medical opinions are in disagreement, a third medical examiner shall be selected in the same manner, and a majority opinion of such health examiners shall be final. (Amended 03-24-82; 11-20-85; 07-31-91; 02-26-92)

When a leave has been granted under this section, the absence shall not be construed as a break in service of such person on leave during the period of time the position is held open (up to ten school months) for any purpose. (Amended 11-20-85; 07-31-91)

In case of absence exceeding ten consecutive school days due to personal illness, including pregnancy-related disability, a full-time-basis substitute teacher may apply for and secure a leave of absence without pay, except as provided in the "sick pay" Rule. Such leave shall not exceed five school months, unless extended; provided, however, that all leaves granted such full-time-basis substitute teachers shall expire at the end of June with the close of the school term. (Amended 03-24-82; 11-20-85; 07-31-91)

A full-time-basis substitute teacher who registers the individual's State of Illinois Substitute, State of Illinois standard, or State of Illinois Transitional Bilingual Certificate with the Educational Service Region of Cook County, will be eligible to apply for and secure another leave of absence upon presentation of proof establishing disability due to continued serious personal illness, including pregnancy-related disability. Said extension will be limited to five school months, and the teacher must pass a health examination by a medical examiner in a manner prescribed by the General Superintendent of Schools before returning to teaching. (Amended 03-24-82; 11-20-85; 07-31-91; 02-26-92)

The replacement of a full-time-basis substitute teacher by a regularly certificated teacher or by another full-time-basis substitute teacher in the position the full-time-basis substitute teacher occupied shall not affect the leave as far as eligibility for sick pay is concerned. (Amended 08-23-67; 03-24-82; 11-20-85; 07-31-91)

**Sec. 4-34. Leave for Illness in Family - Members of Teaching Force.**
The General Superintendent of Schools shall have authority, subject to the approval of the Board of Education, to grant a leave of absence (without pay, except as provided in the "sick pay" Rule) to any full-time, regularly appointed

(Doc. 19c)

lead a person of ordinary sensibilities to conclude that the employee is under the influence of drugs and/or alcohol; observation of possible ingestion of alcohol or use of drugs; and involvement in an accident, excessively aggressive behavior, or other circumstances which could lead a reasonable person to believe that the use of drugs or alcohol may have been involved.

(3)   Disciplinary Action.   Any employee who tests positive for use of drugs and/or alcohol use, or refuses to cooperate with testing procedures, will be subject to discipline up to and including discharge. (Adopted 04-26-89; Amended 07-31-91; 01-22-97) (Effective 04-23-97)

**Sec. 4-51.  Circular of Information - Members of the Teaching Force.** The General Superintendent of Schools shall issue a circular of information, approved by the Board of Education, which shall contain all the regulations concerning eligibility requirements, examinations, and certification. (Amended 12-19-90; 07-31-91 - formerly Sec. 3-5)

**Sec. 4-52.   Special Assignment of Principals.**   The General Superintendent of Schools shall have the authority to assign a principal from the principal's school to a temporary assignment when in the judgment of the General Superintendent of Schools that temporary assignment is in the best interests of the Chicago Public Schools and does not unreasonably compromise the educational program at the principal's school. (Adopted 07-31-91)

**Sec. 4-53.  Notice of Conviction of a Felony.**  Any  employee  who  is convicted either after a bench trial, trial by jury, or plea of guilty of any felony must notify the Director, Department of Human Resources, by letter via certified mail of the date, the fact and the nature of the conviction as well as the name and location of the court in which the conviction occurred. Failure to report in writing within ten days of the conviction, as required by this Board Rule, may constitute cause for dismissal from the service of the Chicago Public Schools. (Adopted 10-28-92; Amended 09-23-98)



**Sec. 4-54.  Fitness for Duty.**   If, in the opinion of the Chief Executive Officer or his designee, any employee of the Chicago Public Schools or the Chicago School Reform Board of Trustees is physically and/or mentally unfit to perform safely and/or efficiently his/her job duties, the Chief Executive Officer or his designee may require an appropriate health examination by a medical professional(s) selected by the Chief Executive Officer.   (Adopted 02-26-97; Amended 01-22-97) (Effective 04-30-97)



**Sec. 2-18. Amendment and Suspension of Rules.** The Rules of the Board of Education may be repealed, amended or added to only at a regular meeting and by a vote of two-thirds of the full membership. Any and all amendments to these Rules shall specify therein the chapter and section thereof sought to be amended.

The Rules may be suspended at any regular meeting by a majority of the full membership then serving; provided, however, that these Rules shall not be suspended for the purpose of repealing, amending, or adding to the same except by a vote of two-thirds of the full membership.

**Sec. 2-19. Annual Adoption of Rules.** The Board of Education shall re-adopt these Board Rules, and any amendments, modifications, repealers, or suspension thereto, by a majority vote of the full membership of the Board at its first regular meeting after the start of each fiscal year. If the Board fails to readopt these Board Rules as set forth in this Rule, the existing Rules shall continue in full force and effect. (Suspended 07-26-95; Rescinded and Adopted New 08-24-05)

**Sec. 2-20. Delivery of Reports to Members.** No report from any department shall be presented for consideration unless the same has been sent to all members 48 hours prior to the meeting date; provided, however, that the President may authorize the presentation of emergency matters without prior submission to members.

**Sec. 2-21. Laying Over Reports.** Upon the request of two or more members, any report presented by any department head or any motion, resolution, order, or Rule presented by any member shall be laid over for one meeting; provided, however, that no matter shall be so laid over for more then

(Doc. 21)

**Sec. 2-27. Delegation of Board Authority.**

a.    *Manner and Effect of Delegation of Authority.* With the exception of those powers and authority exclusively reserved to the Board by the Illinois School Code, as it exists now, or as it may be hereafter amended, the Board may delegate its authority by Board Rule, Board Policy, Board Resolution, Board Report or other Board action. Where the Board has delegated authority to an Officer or his/her designee, that Officer or his/her designee may take all actions consistent with the delegation without further Board action or authority and the action shall be binding upon the Board at the time the Officer acts.

b.    *Authority Not Specifically Delegated.* The Board reserves to itself all authority and power it has not specifically delegated to another under these Rules, in a Board policy, resolution or report or by other Board action.

c.    *Authority over Departments and Delegated Authority.* The Chief Executive Officer, the Chief Operating Officer, the Chief Education Officer, the Chief Purchasing Officer, the Chief Financial Officer and the General Counsel, have the authority to supervise their respective Departments, including all employees within their departments, and to take all actions delegated to them by Board Rule, Policy, Resolution, Board Report or other Board action. Said Officers may delegate their authority to employees within their Departments, including any authority delegated to them by the Board.

d.    *Delegation of Authority to Act.* The Board hereby delegates the following specific authority to the following Officers or their respective designees with respect to making and executing certain agreements, which authority may be exercised without prior Board action or approval. All authority exercised by the Officers pursuant to this Rule shall be reported to the Board on a monthly basis. All of the actions/purchases authorized and taken below shall only be for matters that are presented timely to such officer for future action/purchase. Any and all requests for ratification of an action/purchase already taken which are required to have prior Board approval and/or approval from the respective officers, shall be submitted to the Board for approval or denial, regardless of the dollar amount.

1. The Chief Executive Officer has the authority to authorize and execute any and all intergovernmental agreements and other miscellaneous types of agreement that have no financial impact on the Board, subject to approval as to legal form by the General Counsel.

2. The Chief Operating Officer has the authority to authorize and execute any and all real property leases/licenses where the Board is the landlord/licensor, with a term less than ten (10) years, regardless of the dollar amount, subject to approval as to legal form by the General Counsel (except for leases/licenses at 125 S. Clark Street, Chicago, Illinois, which require prior Board approval); and has the authority to authorize and execute all real property leases/licenses where the Board is the tenant/licensee, the term is less than ten (10) years, and the dollar amount for the term of the lease/license is $75,000 or under, subject to approval as to legal form by the General Counsel.

(Doc. 22)

**Sec. 4-10. Holidays.**

a. *Designation of Holidays.*   The Chief Executive Officer or his/her designee shall schedule all Board holidays, on which days all Board offices shall be closed.  Employees otherwise scheduled to work shall not be scheduled to work on Board holidays, except as necessary for the security and maintenance of facilities.  Holidays that fall on a Sunday shall be observed on the Monday following the holiday.  Holidays that fall on a Saturday shall not be observed.

b. *Holiday Pay and Conditions for Holiday Pay.*  Employees, other than substitute teachers, retired teachers and miscellaneous employees, shall be paid their regular pay for the holiday.  In the case of teachers, "regular pay" includes pay for extended day and regularly scheduled classes authorized on an overtime basis.  To be eligible for holiday pay, employees must work either the day before or the day after the holiday, unless the employee has been approved to use sick or vacation benefit time on those days, except that appointed and temporarily assigned teachers and principals who are appointed or assigned on the day after Labor Day shall be eligible for holiday pay for the Labor Day holiday.  Other eligibility requirements may be established by collective bargaining agreements or Board policies.

c. *Teachers' Religious Holidays.*  Appointed teachers shall be granted up to three (3) non-attendance days with pay in a school year for the observance of religious holidays, which shall not be considered an absence, provided that:

   1. The appointed teacher must give written notice to the school principal at least two (2) days in advance of non-attendance for the religious holiday; and

   2. The cost of providing a substitute teacher shall be deducted from the appointed teacher's pay.

**Sec. 4-11. Employee Benefit Days.**   The Board shall establish sick, personal business and vacation leave policies for employees, other than substitute teachers and miscellaneous employees, which shall set forth rules for the accrual, accumulation and payout upon termination of employment of sick, personal business and vacation benefits days.

**Sec. 4-12.  Family and Medical Leaves of Absence – FMLA Leaves and Supplementary Family and Medical Leaves.**

a. *Applicability of Rule.*  This Rule applies to all Board employees.

35

(Doc. 23)

b. *Types of Family and Medical Leaves Authorized by this Rule.*  The Board shall establish policies for Family and Medical Leave Act leaves and for supplementary family and medical leaves, including, child-rearing leaves, personal illness leaves, and family illness leaves.  Said policies shall establish eligibility criteria for leaves, leave duration, any employee rights to return to a position at termination of leave, and rights to pay during leave.

c. *Coordination with Other Laws, Regulations and Policies.*  All leaves granted under this Rule to employees eligible for FMLA leaves shall be designated as FMLA leaves for the first twelve (12) workweeks of the leave during any twelve (12) month period. FMLA leaves shall be concurrent with any other leave authorized by this Rule.

d. *Coordination of Leaves.*  All leaves the Chief Executive Officer or his/her designee grant under this Rule to employees eligible for FMLA leaves shall be designated as FMLA leaves for the first twelve (12) workweeks of the leave during any twelve (12) month period. FMLA leaves shall be concurrent with any other leave authorized by this Rule.

e. *Effect of Leave on Probationary Periods.*  Any probationary appointed teacher granted a leave of thirty (30) or more consecutive calendar days, including a FMLA leave, shall have his/her probationary period extended by the duration of the leave granted under this Rule.  This Rule shall not apply to intermittent leaves.

f. *Leave Required.*  Any employee subject to this Rule shall be required to seek a leave if the employee is absent from work or anticipates that he/she will be absent from work for more than ten (10) consecutive workdays, or if the employee anticipates the need for an on-going, intermittent leave.  The Chief Executive Officer or his/her designee may seek to discipline or dismiss an employee who fails to apply for a leave under this Rule in accordance with the Board's Employee Discipline and Due Process Policy.

g. *Medical Certification for Leave.*  All requests for leave or, where available, requests for leave extensions, must be supported by a certification from an appropriately licensed health-care provider.  In accordance with applicable law, the Chief Executive Officer or his/her designee may require that an employee seeking a leave or on a leave to submit to periodic evaluation by an appropriately licensed health-care provider regarding the necessity of a leave or continued necessity of a leave.  In cases of a dispute regarding the necessity of a leave, the Chief Executive Officer or his/her designee shall direct an employee to submit to an evaluation by an appropriately licensed health-care provider and request the health-care provider's opinion regarding the necessity of a leave.  In cases where appropriately licensed health-care providers issue conflicting opinions or certifications of the necessity, or lack

36



(Doc. 23a)

thereof, for a leave, the Chief Executive Officer or his/her designee shall direct the employee to submit to an evaluation of a third appropriately licensed health-care provider, whose opinion and certification regarding the necessity, or lack thereof, for a leave will be controlling. The employee or his/her health-care provider shall select the third health-care provider from a list maintained by the Chief Executive Officer or his/her designee. The cost of the evaluation and opinion by the third health-care provider shall be borne by the Board. An employee's failure or refusal to submit to any evaluation directed by the Chief Executive Officer or to cooperate in the evaluation or the health-care provider's selection shall be grounds for discipline or dismissal from employment. In cases where the health-care provider's opinion is that the employee should be on a leave, the health-care provider shall establish a date for re-evaluation to determine the continued necessity of the leave.

h. *Maintenance of Insurance Benefits During Leaves.* An employee granted a leave under this Rule shall maintain all insurance benefits during his/her leave provided that the employee pays the employee's premium contribution for the insurance.

i. *Prohibition Against Secondary Employment During Certain Leaves of Absence.* Employees who are granted a leave of absence for their own serious medical condition or their own personal illness under this Rule shall not work secondary employment during the period of the leave, including any leave extension.

**Sec. 4-13.  Involuntary Personal Illness Leaves- Fitness for Duty Leaves.** The Chief Executive Officer or his/her designee shall have the authority to place an employee on an involuntary illness leave if the Chief Executive Officer or his/her designee determines that the employee's physical or mental health renders the employee unfit to perform the duties of the employee's position.

a. *Examination of Employees Deemed Unfit for Duty.* The Chief Executive Officer or his/her designee may require employees whose fitness for duty is at issue to submit to examinations and evaluations by appropriately licensed health-care providers to determine the employee's fitness to perform his or her duties.

b. *Involuntary Personal Illness Leave for Employees Determined to be Unfit for Duty.* If an employee is determined to be unfit to perform the employee's duties, the employee shall be placed on an involuntary personal illness leave and shall have all the same rights afforded to employees on voluntary personal illness leaves in accordance with the applicable personal illness leave policy.

37



c.    *Disputes Over Fitness for Duty.*  If an employee who is placed on an involuntary personal illness leave disputes the appropriately licensed health-care provider's determination that he/she is unfit to perform his/her duties, the employee must submit an opinion from another appropriately licensed health-care provider that he/she is fit for duty, and the resulting dispute shall be resolved in accordance with the provisions of Rule 4-12(g).

d.    *Duration of Involuntary Personal Illness Leave.*    An involuntary personal illness leave shall have a duration of no more than twenty-five (25) work months.

e.    *Termination of Involuntary Personal Illness Leave.*    An involuntary personal illness leave shall terminate on the earlier of:  1) certification that the employee is fit for duty by an appropriate health-care professional approved by the Chief Executive Officer, or, 2) the expiration of twenty-five (25) work months.

f.    *Tenured Teachers and Contract Principals Who Remain Unfit for Duty at the Expiration of Twenty-Five (25) Work Months.*  If, after the expiration of twenty-five (25) work months on an involuntary personal illness leave, a tenured teacher or a contract principal remains unfit for duty, the tenured teacher or contract principal shall be dismissed in accordance with the Illinois School Code and the Employee Discipline and Due Process Policy.    For purposes of this Rule, an employee who has remained unfit for duty due to a mental or physical incapacity for six (6) or more work months shall not be deemed to be suffering from a temporary mental or psychological impairment, as defined by the Illinois School Code, and nothing in this Rule shall prevent the Board from dismissing a tenured teacher or a contract principal who has been mentally or psychologically incapacitated for more than six (6) months.

*synonymous*

g.    *All Other Employees Who Remain Unfit for Duty at the Expiration of Twenty-Five Work Months.*    If, after the expiration of twenty-five (25) work months on an involuntary personal illness leave, an employee, other than a tenured teacher or a contract principal, remains unfit for duty and is not collecting a permanent disability pension from the Chicago Municipal Employees Annuity Fund, the employee shall be deemed absent without leave and honorably terminated in accordance with the Employee Discipline and Due Process Policy. For purposes of this Rule, an employee who has remained unfit for duty due to a mental or psychological impairment for six (6) or more work months shall not be deemed to be suffering from a temporary mental or psychological impairment, as defined by the Illinois School Code, and nothing in this Rule shall prevent the Board from dismissing an employee who has been mentally or psychologically incapacitated for more than six (6) months.



(Doc. 24a)



**Board of Education of the City of Chicago**
**Law Department**

Patrick J. Rocks
General Counsel

125 South Clark Street
Suite 700
Chicago, Illinois 60603
Telephone 773/553-1700
FAX 773/553-1752

September 30, 2005

<u>VIA FACSIMILE: (312) 795-1225</u>
<u>AND U.S. MAIL</u>

Deidre Baumann, Esq.
Baumann Shuldiner & Lee
79 West Monroe Street, Suite 900
Chicago, Illinois 60603

Dear Ms. Bauman:

Enclosed is a copy of letter your client submitted directly to the office of Michael Scott, President of the Board of Education. Because we understand you continue to represent her in this matter, we are responding on behalf of the Board to you, and not directly to your client.

As you know from the meeting on September 2, 2005, with you and your client, Ms. Searles has not accurately described several matters that were discussed at that time. I am writing to clarify the Board's position with respect to some of those issues.

First, the Law Department did not extend Ms. Searles's involuntary leave status. As we stated in the meeting, the original end date of September 23, 2005 appears to have been calculated based on calendar months rather than school months. When school months are used, the leave expires in February 2006. Your client recently made a direct request to the CPS Office of Labor and Employee Relations for clarification of this issue. <u>It is our understanding that a letter indicating the correct date of the leave will be sent to her in the near future.</u> When we receive a copy of that letter, we will forward a copy to your office, too.

Second, we agreed that Ms. Searles would forward a letter from a psychiatrist or psychologist stating the opinion that she was fit to resume duties as a teacher. We also agreed that if CPS personnel did not agree with the evaluation, they would schedule Ms. Searles for an evaluation by a psychiatrist or psychologist selected by CPS. We then agreed that if Ms. Searles's evaluation and the CPS evaluation reached different conclusions, the attorneys for each party would agree on a neutral physician or psychologist who would examine both reports and Ms. Searles, and provide a report. The parties agreed to be bound by that report, subject to any rights either party might have to seek judicial review of the neutral's determination. We agreed to disagree on how to select the neutral for now, and to treat that issue if or when necessary.



Deidre Baumann
September 30, 2005
Page 2

The letter we received from Dr. Sharon Lieteau, M.D. dated September 17, 2005 consists of three sentences. It does not provide an explanation of the opinion that Ms. Searles is fit to be a teacher. Nonetheless, CPS intends to proceed as outlined above. CPS staff is in the process of identifying a psychiatrist or psychologist to evaluate Ms. Searles and will provide instructions to her regarding that evaluation in the near future. As a courtesy, this office will forward to you copies of any correspondence we receive regarding this notice.

Third, we did have preliminary settlement discussions at our meeting. I indicated that CPS would be willing to consider a more generous settlement if Ms. Searles would agree to resign and not be rehired. I explained that finality had some value to the Board and that to the extent finality could be achieved by agreement, the Board would consider that factor in settlement negotiations. We asked that Ms. Searles consider her settlement position and authorize you to submit a settlement demand for our consideration. To date, we have not received the demand, but remain willing to consider any reasonable proposals you may submit.

Fourth, at our meeting, Ms. Searles did request interim employment pending the resolution of her fitness for duty. I explained that the request should be made in the context of our settlement discussions. As such, it should be made by you in writing as part of a comprehensive resolution of this dispute. I understand that following our meeting, you followed-up verbally with Law Department attorneys regarding the prospect of immediate, interim employment for Ms. Searles. Law Department attorneys responded to you directly, once again declining any present consideration of interim employment consistent with my position during the September 2nd meeting. To the extent Ms. Searles is seeking to apply for employment outside the context of the pending dispute and related settlement negotiations, that request should not be made to the Law Department, but instead to the Department of Human Resources. Our role in this process is to represent the interests of the Board in relation to legal challenges brought by Ms. Searles, not to convey verbal requests by her for employment to unspecified departments at CPS.

I hope this letter clarifies our position on these issues. I remain willing to consider reasonable settlement demands. And, I look forward to the prompt resolution of the fitness for duty inquiry.

Sincerely,

PATRICK J. ROCKS
General Counsel

PJR:SLT:bw
Enclosure
Cc:   Michael W. Scott
      Rachel Resnick
      Cheryl Colston

( Doc. 25a)



**CHICAGO PUBLIC SCHOOLS**

## Department of Human Resources . Bureau of Employee Health Services
125 South Clark Street, 2nd Floor . Chicago, IL 60603
Telephone 773/553-1180 . Fax 773/553-1181 . e-mail: EHS@csc.cps.k12.il.us
www.cps-humanresources.org

Sandra M. Johnson, R.N.
Case Manager

October 12, 2005

Ms. Queen Searles
8729 S. Commercial
Chicago, Illinois 60617

Dear Ms. Searles:

This letter is to confirm that this office is in receipt of the letter from Dr. Sharon Lietrau indicating your fitness to return to work.

Please be advised that your current Leave of Absence is effective through February 22, 2006. Further be advised that pursuant to the process to reinstate you as a teacher, you will be re-evaluated by a psychiatrist or psychologist. Toward that end, we have scheduled you for an appointment on October 19, 2005 at 1:00 P.M. The location of your appointment is MercyWorks on Ashland, 3316 S. Ashland, Chicago, Illinois 60608. Please call this office at (773) 553-1180, if you have any questions.

Sincerely,

Sandra M. Johnson, R.N.

cc:     Ms. Cheryl J. Colston, Director, Employee Relations
Mr. Patrick J. Rocks, General Counsel, Law Department

SJ: elg

(Doc 26)



# community
## MENTAL council INC.
### HEALTH

B704 SOUTH CONSTANCE AVENUE ♦ CHICAGO, ILLINOIS 60617 ♦ (773) 734-4033 ♦ FAX: (773) 734-6447 OR 5994
TTY: (773) 734-2440 ♦ WEBSITE: thecouncil-online.org
TOLL-FREE CRISIS (877) 311-3222

6239 South Western Avenue ♦ Chicago, IL 60636 ♦ (773) 863-9749 ♦ Fax: (773) 863-9782
1228 Towanda Drive ♦ Bloomington, IL 61701 ♦ (309) 827-2945 ♦ Fax: (309) 827-6195
110 East 79th Street ♦ Chicago, IL  60619 ♦ (312) 747-0901 ♦ Fax: (312) 747-8763

**BOARD OF DIRECTORS**

**OFFICERS**

Barbara J. Martin, Ph.D.
Chairperson

Dorothy Holley-Turner, Ph.D.
Chairperson-Elect

Michael Fisher
Treasurer

Joyce Rosenblatt-Juron
Treasurer-Elect

Anthony Leggett
Acting Secretary

Elvie Rhone, Ph.D.
Secretary-Elect

Anne Myles-Smith, Esq.
Parliamentarian

Reverend Henry Soles
Parliamentarian-Elect

**MEMBERS**

Shaffdeen A. Amuwo, Ph.D.
Eric Von Battles, Sr.
Evelyn Byrdsong
Bill Harlan
Kenneth Hennings
Father Michael Pfleger
Yolanda Price
Victoria Reid, Ph.D.
Lottie Taylor
Paul L. Williams
Darlene Wright, Ph.D.

Carl C. Bell, M.D.
President & CEO
Ex-Officio



Member of the
United Way Network

December 13, 2005

To whom it may concern,

Ms.. Queen Searles is a patient under my care. She was seen for

Psychiatric evaluations on March 30, 2004 and on October 18, 2005.

She received one follow-up appointment on December 7, 2005. The

results of her evaluations were as follows:  no suicidal or homicidal

ideations. No psychotic symptoms, no evidence of depression or anxiety.

She did display some frustration at the on going legal process she is

involved with, but no actual irritability or violent overtones. She was

diagnosed with Adjustment Disorder unspecified and required no

medications and no further follow-up.

Franchot B. Givens M.D.

Franchot B. Givens, M.D.

Staff Psychiatrist

( Doc. 27a )

"SAVING LIVES..."

September 17, 2005
RE: Queen Tiye Searles

To whom it may concern:

I initially evaluated Ms. Searles in 2003 and she has been my patient for the past 6 months. Ms. Searles has no psychiatric diagnosis that would prevent her from fulfilling her responsibilities as a teacher. She is fit to return to duty at any time.

SHARON LIETEAU, MD
PSYCHIATRIST
Llc# 036-060076

(Doc. 27)



## CHICAGO PUBLIC SCHOOLS

**Department of Human Resources . Bureau of Employee Health Services**
125 South Clark Street, 2nd Floor . Chicago, IL 60603
Telephone 773/553-1180 . Fax 773/553-1181 . e-mail: EHS@csc.cps.k12.il.us
www.cps-humanresources.org

Sandra M. Johnson, R.N.
Case Manager

January 12, 2006

Ms. Queen Searles
8729 S. Commercial Ave.
Chicago, Illinois 60617

Dear Ms. Searles:

Employee Health Services received a report from Elizabeth H. Thompson, Psy.D, in which Dr. Thompson concludes that as of December 29, 2005, you are fit to return to duty. A copy of Dr. Thompson's report is enclosed for your information. Pursuant to Board Rules 4-12 and 4-13 and the Board's Supplemental Family and Medical Leave Policy, you are eligible to become a probationary assigned teacher, if a principal appoints you to a full-time teacher position. Because you were a first year probationary appointed teacher at the time your leave commenced, you will be classified as a second year probationary appointed teacher if a principal appoints you to a full-time teacher position.

An appointment with a teacher recruitment specialist, Mr. Michael Atilano, has been made for you at 125 South Clark Street, 2nd Floor, Chicago, Illinois, 60603 for Thursday, January 19, 2006 at 10:00 a.m. Mr. Atilano will work with you to identify employment opportunities within Chicago Public Schools.

Sincerely,

Sandra M. Johnson, R.N.
Case Manager

cc:     Mr. Ascension Juarez, Chief Officer, Human Resources
        Ms. Nancy Slavin, Director, Recruitment Center
        Mr. Michael Atilano, Recruitment Center

SMJ: eig

Enclosure

(DOC. 28)

# BAUMANN & SHULDINER

### ATTORNEYS AT LAW

PAUL R. SHULDINER
DEIDRE BAUMANN

SUITE 900
79 WEST MONROE STREET
CHICAGO, ILLINOIS 60603

TELEPHONE
(312) 372-8242

FACSIMILE
(312) 795-1225

October 14, 2005

Debra A. Harvey
Assistant General Counsel
Board of Education of the City of Chicago
Law Department
125 South Clark Street, Suite 700
Chicago, Illinois 60603
<u>VIA HAND DELIVERY</u>

<u>Re</u>:     *Searles v. Board of Education, etc. et al.*
         Case No. 04 CH 21856

Dear Ms. Harvey:

In furtherance of our settlement discussions, my client has two alternative demands, the former of which is preferred, subject to a medical release as previously discussed:

(1)     Immediate return to the classroom with full back pay, including benefits, damages in an amount of $150,000.00 and expungement from her employment records, any references to her forced medical leave, the litigation relating thereto, and anything related to Ms. Searles inability or unfitness to teach. I also understand you wish Ms. Searles to go back to Mercy Works for an evaluation. As Dr. Thomas Lambert, from Mercy Works, has been a litigant in these proceedings, this settlement proposal is contingent upon Ms. Searles being sent to another medical examiner from a facility other than Mercy Works. Surely, the Board of Education contracts with more than one facility.

Or, in the alternative,

(2)     Full back pay, including benefits, damages in an amount of $350,000.00 and expungement from her employment records, any references to her forced medical leave, the litigation relating thereto, and anything related to Ms. Searles inability or unfitness to teach.


(Doc. 29)

In consideration of either of the foregoing, Ms. Searles will release the Board and all of its agents from liability for any event occurring through the time of mutual acceptance.

Ms. Searles will be unable to attend the medical examination scheduled for October 19, 2005. Please provide an alternative date, as well as the name and address of the medical examiner you wish her to see. In no event, should Ms. Searles see Dr. Lambert or anyone associated with him.

I look forward to hearing from you.

Sincerely yours,

Deidre Baumann

cc:     Queen Searles

(Doc. 29a)



**CPS** CHICAGO PUBLIC SCHOOLS

**Department of Human Resources . Bureau of Employee Health Services**

125 South Clark Street, 2nd Floor . Chicago, IL 60603
Telephone 773/553-1180 . Fax 773/553-1181 . e-mail: EHS@csc.cps.k12.il.us
www.cps-humanresources.org

December 16, 2005

Queen Tiye Searles
8729 South Commercial Avenue
Chicago, Illinois 60617

Dear Ms. Searles:

On December 12, 2005, you spoke with Cheryl Colston, director of Labor and Employee Relations, and informed her that you wanted to reschedule the appointment you had previously canceled. At the time you canceled the last appointment, you advised that you did not want to be evaluated by doctors at Mercy Works. Therefore, Ms. Colston advised you that your request is being honored. We are in the process of scheduling you for an appointment with Dr. Elizabeth Thompson. Her office is located at 1116 North Pine, Arlington Heights, Illinois 60004.

We will contact you within the next few days to provide you with the date and time for the appointment. If you have any questions, feel free to contact me at (773) 553-1183 or Cheryl Colston at (773) 553-1714.

Sincerely,

Sandra M. Johnson

cc:    Deidre Baumann

(Doc. 30)



**CHICAGO PUBLIC SCHOOLS**

**Department of Human Resources . Bureau of Employee Health Services**
125 South Clark Street, 2ⁿᵈ Floor . Chicago, IL 60603
Telephone 773/553-1180 . Fax 773/553-1181 . e-mail: EHS@csc.cps.k12.il.us
www.cps-humanresources.org

Sandra M. Johnson, R.N.
Case Manager

December 20, 2005

Ms. Queen A. Tiye Searles
8729 S. Commercial Ave.
Chicago, Illinois 60617

Dear Ms. Searles:

Be advised that pursuant to your conversation with Ms. Cheryl Colston, Director of Labor and Employee Relations, and the process to reinstate you as a Teacher, you have been re-scheduled to be evaluated by Dr. Elizabeth Thompson. Your appointment has been scheduled for Thursday, December 29, 2005, at 9:00am., at the following location:

> 1116 North Pine
> Arlington Heights, Illinois 60004
> (847) 253-5069

Dr. Thompson advises that you call her for directions to her office prior to your appointment. If you have any questions, please contact the undersigned at (773) 553-1180.

Sincerely,

Sandra M. Johnson

cc:    Ms. Deidre Bauman

(Doc 30 a)

Home Page > Executive Branch > Code of Federal Regulations > Electronic Code of Federal Regulations

# Electronic Code of Federal Regulations (e-CFR)

## BETA TEST SITE

## e-CFR Data is current as of October 25, 2006

### Title 29: Labor
PART 825—THE FAMILY AND MEDICAL LEAVE ACT OF 1993
Subpart C—How do Employees Learn of Their FMLA Rights and Obligations, and What Can an Employer Require of an Employee?

Browse Previous | Browse Next

### § 825.310  Under what circumstances may an employer require that an employee submit a medical certification that the employee is able (or unable) to return to work (i.e., a "fitness-for-duty" report)?

(a) As a condition of restoring an employee whose FMLA leave was occasioned by the employee's own serious health condition that made the employee unable to perform the employee's job, an employer may have a uniformly-applied policy or practice that requires all similarly-situated employees (i.e., same occupation, same serious health condition) who take leave for such conditions to obtain and present certification from the employee's health care provider that the employee is able to resume work.

(b) If State or local law or the terms of a collective bargaining agreement govern an employee's return to work, those provisions shall be applied. Similarly, requirements under the Americans with Disabilities Act (ADA) that any return-to-work physical be job-related and consistent with business necessity apply. For example, an attorney could not be required to submit to a medical examination or inquiry just because her leg had been amputated. The essential functions of an attorney's job do not require use of both legs; therefore such an inquiry would not be job related. An employer may require a warehouse laborer, whose back impairment affects the ability to lift, to be examined by an orthopedist, but may not require this employee to submit to an HIV test where the test is not related to either the essential functions of his/her job or to his/her impairment.

(c) An employer may seek fitness-for-duty certification only with regard to the particular health condition that caused the employee's need for FMLA leave. The certification itself need only be a simple statement of an employee's ability to return to work. A health care provider employed by the employer may contact the employee's health care provider with the employee's permission, for purposes of clarification of the employee's fitness to return to work. No additional information may be acquired, and clarification may be requested only for the serious health condition for which FMLA leave was taken. The employer may not delay the employee's return to work while contact with the health care provider is being made.

(d) The cost of the certification shall be borne by the employee and the employee is not entitled to be paid for the time or travel costs spent in acquiring the certification.

(e) The notice that employers are required to give to each employee giving notice of the need for FMLA leave regarding their FMLA rights and obligations (see §825.301) shall advise the employee if the employer will require fitness-for-duty certification to return to work. If the employer has a handbook explaining employment policies and benefits, the handbook should explain the employer's general policy regarding any requirement for fitness-for-duty certification to return to work. Specific notice shall also be given to any employee from whom fitness-for-duty certification will be required either at the time notice of the need for leave is given or immediately after leave commences and the employer is advised of the medical circumstances requiring the leave, unless the employee's condition changes from one that did not previously require certification pursuant to the employer's practice or policy. No second or third fitness-for-duty certification may be required.

( Doc. 31 )

Home Page > Executive Branch > Code of Federal Regulations > Electronic Code of Federal Regulations

# Electronic Code of Federal Regulations (e-CFR)

## BETA TEST SITE

## e-CFR Data is current as of October 25, 2006

### Title 29: Labor
PART 825—THE FAMILY AND MEDICAL LEAVE ACT OF 1993
Subpart B—What Leave Is an Employee Entitled To Take Under the Family and Medical Leave Act?

Browse Previous | Browse Next

### § 825.215  What is an equivalent position?

(a) An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

(b) If an employee is no longer qualified for the position because of the employee's inability to attend a necessary course, renew a license, fly a minimum number of hours, etc., as a result of the leave, the employee shall be given a reasonable opportunity to fulfill those conditions upon return to work.

(c) *Equivalent Pay.* (1) An employee is entitled to any unconditional pay increases which may have occurred during the FMLA leave period, such as cost of living increases. Pay increases conditioned upon seniority, length of service, or work performed would not have to be granted unless it is the employer's policy or practice to do so with respect to other employees on "leave without pay." In such case, any pay increase would be granted based on the employee's seniority, length of service, work performed, etc., excluding the period of unpaid FMLA leave. An employee is entitled to be restored to a position with the same or equivalent pay premiums, such as a shift differential. If an employee departed from a position averaging ten hours of overtime (and corresponding overtime pay) each week, an employee is ordinarily entitled to such a position on return from FMLA leave.

(2) Many employers pay bonuses in different forms to employees for job-related performance such as for perfect attendance, safety (absence of injuries or accidents on the job) and exceeding production goals. Bonuses for perfect attendance and safety do not require performance by the employee but rather contemplate the absence of occurrences. To the extent an employee who takes FMLA leave had met all the requirements for either or both of these bonuses before FMLA leave began, the employee is entitled to continue this entitlement upon return from FMLA leave, that is, the employee may not be disqualified for the bonus(es) for the taking of FMLA leave. *See* §825.220 (b) and (c). A monthly production bonus, on the other hand does require performance by the employee. If the employee is on FMLA leave during any part of the period for which the bonus is computed, the employee is entitled to the same consideration for the bonus as other employees on paid or unpaid leave (as appropriate). *See* paragraph (d)(2) of this section.

(d) *Equivalent Benefits.* "Benefits" include all benefits provided or made available to employees by an employer, including group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions, regardless of whether such benefits are provided by a practice or written policy of an employer through an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1002(3).

(1) At the end of an employee's FMLA leave, benefits must be resumed in the same manner and at the same levels as provided when the leave began, and subject to any changes in benefit levels that may have taken place during the period of FMLA leave affecting the entire workforce, unless otherwise elected by the employee. Upon return from FMLA leave, an employee cannot be required to requalify for any benefits the employee enjoyed before FMLA leave began (including family or dependent coverages). For example, if an employee was covered by a life insurance policy before taking leave but

Doc. 32-)

is not covered or coverage lapses during the period of unpaid FMLA leave, the employee cannot be required to meet any qualifications, such as taking a physical examination, in order to requalify for life insurance upon return from leave. Accordingly, some employers may find it necessary to modify life insurance and other benefits programs in order to restore employees to equivalent benefits upon return from FMLA leave, make arrangements for continued payment of costs to maintain such benefits during unpaid FMLA leave, or pay these costs subject to recovery from the employee on return from leave. See §825.213(b).

(2) An employee may, but is not entitled to, accrue any additional benefits or seniority during unpaid FMLA leave. Benefits accrued at the time leave began, however, (e.g., paid vacation, sick or personal leave to the extent not substituted for FMLA leave) must be available to an employee upon return from leave.

(3) If, while on unpaid FMLA leave, an employee desires to continue life insurance, disability insurance, or other types of benefits for which he or she typically pays, the employer is required to follow established policies or practices for continuing such benefits for other instances of leave without pay. If the employer has no established policy, the employee and the employer are encouraged to agree upon arrangements before FMLA leave begins.

(4) With respect to pension and other retirement plans, any period of unpaid FMLA leave shall not be treated as or counted toward a break in service for purposes of vesting and eligibility to participate. Also, if the plan requires an employee to be employed on a specific date in order to be credited with a year of service for vesting, contributions or participation purposes, an employee on unpaid FMLA leave on that date shall be deemed to have been employed on that date. However, unpaid FMLA leave periods need not be treated as credited service for purposes of benefit accrual, vesting and eligibility to participate.

(5) Employees on unpaid FMLA leave are to be treated as if they continued to work for purposes of changes to benefit plans. They are entitled to changes in benefits plans, except those which may be dependent upon seniority or accrual during the leave period, immediately upon return from leave or to the same extent they would have qualified if no leave had been taken. For example if the benefit plan is predicated on a pre-established number of hours worked each year and the employee does not have sufficient hours as a result of taking unpaid FMLA leave, the benefit is lost. (In this regard, §825.209 addresses health benefits.)

(e) *Equivalent Terms and Conditions of Employment.* An equivalent position must have substantially ※※ similar duties, conditions, responsibilities, privileges and status as the employee's original position.

(1) The employee must be reinstated to the same or a geographically proximate worksite (*i.e.,* one that does not involve a significant increase in commuting time or distance) from where the employee had previously been employed. If the employee's original worksite has been closed, the employee is entitled to the same rights as if the employee had not been on leave when the worksite closed. For example, if an employer transfers all employees from a closed worksite to a new worksite in a different city, the employee on leave is also entitled to transfer under the same conditions as if he or she had continued to be employed.

(2) The employee is ordinarily entitled to return to the same shift or the same or an equivalent work schedule.

(3) The employee must have the same or an equivalent opportunity for bonuses, profit-sharing, and other similar discretionary and non-discretionary payments.

(4) FMLA does not prohibit an employer from accommodating an employee's request to be restored to a different shift, schedule, or position which better suits the employee's personal needs on return from leave, or to offer a promotion to a better position. However, an employee cannot be induced by the ※※ employer to accept a different position against the employee's wishes.

(f) The requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis or intangible, unmeasurable aspects of the job. However, restoration to a job slated for lay-off when the employee's original position is not would not meet the requirements of an equivalent position.

Browse Previous | Browse Next

Doc 32 b

*The U.S. Equal Employment Opportunity Commission*

# The Americans with Disabilities Act of 1990, Titles I and V

An Act To establish a clear and comprehensive prohibition of discrimination on the basis of disability.

SEC. 12101. *[Section 2]*

(a) Findings. – The Congress finds that-

(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, **individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;**

(5) individuals with disabilities continually encounter various forms of discrimination, **including outright intentional exclusion,** the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary **qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, obs, or other opportunities;**

(6) census data, national polls, and other studies have documented that **people with disabilities,** as a group, occupy an inferior status in our society, and **are severely disadvantaged socially, vocationally, economically, and educationally;**

(7) **individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment,** and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and **resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and on tribute to, society;**



(Doc. 32 C-1)

(8) **the Nation's proper goals** regarding individuals with disabilities **are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and**

(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United
States billions of dollars in unnecessary expenses resulting from dependency and no productivity.

DEFINITIONS

SEC. 12102. *[Section 3]*

(2) Disability. - The term ``disability'' means, with respect to an individual-

(A) **a physical or mental impairment that substantially limits one or more of the major life activities of such individual;**

(B) a record of such an impairment; or

(C) **being regarded as having such an impairment.**

SEC. 12111. *[Section 101]*

(8) Qualified individual with a disability. - The term ``qualified individual with a disability'' means **an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.**

(9) **Reasonable accommodation.** - The term ``reasonable accommodation'' may include-

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) **job restructuring,** part-time or modified work schedules, **reassignment to a vacant position,** acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals
with disabilities.

**DISCRIMINATION**

SEC. 12112. *[Section 102]*

(a) General rule. - **No covered entity shall discriminate against a qualified individual with a disability** because of the disability of such individual in **regard to** job application procedures, the hiring, **advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.**

(b) **Construction.** - As used in subsection (a) of this section, the term ``discriminate'' includes-



(1) **limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;**



(3) **utilizing standards, criteria, or methods of administration-**

(A) that have the effect of discrimination on the basis of disability; or

(B) that perpetuate the discrimination of others who are subject to common administrative control;

(4) **excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability** of an individual with whom the qualified individual is known to have a relationship or association;

(5) **(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability** who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or



(B) **denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee** or applicant;

(6) **using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability** or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) **failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant.**

(d) Medical examinations and inquiries. -

(A) **Prohibited examinations and inquiries. - A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability** or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job related and consistent with business necessity.

(B) Acceptable examinations and inquiries. - A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job related functions.

(C) Requirement. - Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).



DEFENSES

SEC. 12113. *[Section 103]*

(a) In general. - It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

(b) Qualification standards. - The term ``qualification standards'' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

**PROHIBITION AGAINST RETALIATION AND COERCION**

SEC. 12203. *[Section 503]*

(a) **Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge,** testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) **Interference, coercion, or intimidation. - It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed,** or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, **any right granted or protected by this chapter.**



**Board of Education of the City of Chicago**
**Law Department**

Patrick J. Rocks
General Counsel

125 South Clark Street
Suite 700
Chicago, Illinois 60603
Telephone 773/553-1700
FAX 773/553-1702

January 23, 2006

Deidre Baumann, Esq.
Baumann & Shuldiner

79 West Monroe Street
Suite 900
Chicago, Illinois 60603

RE:    **Queen Searles**

Dear Ms. Baumann:

I am writing on behalf of the Board of Education to respond to your earlier settlement demand and to renew our efforts to resolve all outstanding disputes between Ms. Searles and the Board. In an effort to resolve this matter, the Board is prepared to enter into a settlement agreement in which Ms. Searles would immediately be placed in the reassigned teacher's pool. Generally, only tenured teachers are placed in this pool. We are aware of past arguments by Ms. Searles that she is a tenured teacher. Ms. Searles, however, experienced a break in service when she resigned from the Board in 2001. As a result of the break in service, she currently is a probationary teacher and will not regain tenured status until she completes her fourth year of probation. It important that you and Ms. Searles understand the Board is neither willing nor able to vest Ms. Searles with tenured status. Instead, we are willing to extend to Ms. Searles the benefits of participation in the reassigned teacher's pool that otherwise are not available to probationary teachers in exchange for settlement of all claims and disputes.

We are prepared to make this exception for Ms. Searles so that she can begin to receive a salary and benefits while she searches for a new teaching position. Teachers remain in the reassigned teacher's pool for ten months. If a teacher secures a teaching position during that time, he or she is removed from the reassigned teacher's pool and placed into the position. If a teacher is unable to secure a teaching position during that time, at the end of the ten month period he or she is honorably terminated. The same provisions would apply to Ms. Searles as a result of this proposed settlement even though she is a probationary teacher.

Doc. 33

Deidre Baumann, Esq.
January 23, 2006
Page 2

In exchange for and in consideration of this offer, we would require that Ms. Searles dismiss all pending matters, including all claims, appeals, grievances and charges, and that she provide a global release to the Board and its officers, employees and agents of any and all liabilities.

If this proposal is acceptable to your client, please inform Debra Harvey immediately. She will prepare a draft settlement agreement using our typical format for such agreements and forward it to you for your review and approval. Upon execution of the written agreement, Ms. Searles would be placed in the reassigned teacher's pool as described above.

Sincerely,

PATRICK J. ROCKS
General Counsel

PJR:bw

Doc 33a

**STATE OF ILLINOIS**
**DEPARTMENT OF EMPLOYMENT SECURITY**
**APPEALS DIVISION**
**REFEREE'S DECISION**

APPEAL DOCKET AR-3058260A

**LOCAL OFFICE:** 012

CLAIMANT: (APPELLANT)

**EMPLOYER:**

Tina F Allen aka Queen Searles
P.O. Box 178523
Chicago IL 60617

Chicago Public Schools
125 S. Clark St.-14th Floor
Chicago IL 60603-5200

| | | |
|---|---|---|
| **SOCIAL SECURITY NUMBER:** | **DATE OF HEARING:** | 11/20, 12/4 & 12/9/03 |
| **DATE OF APPEAL:** October 27,2003 | **PLACE OF HEARING:** | Chicago |
| **DATE OF RECONSIDERATION:** October 31,2003 | **DATE OF MAILING:** | December 10, 2003 |

**APPEARANCES/ISSUES/EMPLOYER STATUS:** The claimant and the employer appeared and testified at the hearing. The issue is: Was the claimant able to, available for, and actively seeking work during the relevant period as required by Section 500C of the Illinois Unemployment Insurance Act? The employer is a party to this appeal.

**FINDINGS OF FACT:** The claimant was a high school teacher from October 1988 until September 12, 2003, when she was found to be psychologically unfit to teach. Her Work Search Record shows that, during the first benefit week at issue, she contacted her employer and her union five times in an effort to get a non-teaching job with the employer. All of these contacts were with separate individuals. During the second benefit week at issue she contacted another person with the union again in an attempt to get a non-teaching job. She also checked job postings on the employer's internet site. She applied with three private employers for jobs as a loan processor, office worker, receptionist and food preparer. She has extensive experience as a loan processor.

**CONCLUSION:** Section 500C of "The Unemployment Insurance Act" provides, in part, that an unemployed individual shall be eligible to receive benefits with respect to any week only if the Director finds that he is able to work, and is available for work; provided that during the period in question he was actively seeking work and he has certified such on a form provided by the Department listing the places at which he has sought work.

The evidence showed that the claimant was available for work, was able to work in a capacity other than teaching and was actively seeking work within the meaning of Section 500C during the period in question. She conducted an adequate job search. Therefore, she is eligible to receive benefits under Section 500C of the Act for the period under review.

**DECISION:** The determination of the Local Office is SET ASIDE. Under Section 500C of the Illinois Unemployment Insurance Act, eligibility for benefits is allowed, as to this issue only, from September 28, 2003 through October 11, 2003.

DWO

DAVID W. OTT, Hearings Referee   503

**RIGHT OF FURTHER APPEAL:** This decision will become final, unless WRITTEN NOTICE of appeal from the decision is filed within thirty days from the date of mailing shown above. The notice of appeal must be filed at the local unemployment insurance office where the claim is filed, with the Board of Review at 401 South State, Chicago, Illinois 60605, or by FAX at 312-793-2373.

Q:\PDOXAPPS\DM\DOCS\3058260A.LF1

(Doc 34)

(106 ILCS 5/34-85) (from Ch. 122, par. 34-85)
    Sec. 34-85. Removal for cause; Notice and hearing; Suspension. No teacher employed by the board of education shall (after serving the probationary period specified in Section 34-84) be removed except for cause. No principal employed by the board of education shall be removed during the term of his or her performance contract except for cause, which may include but is not limited to the principal's repeated failure to implement the school improvement plan or to comply with the provisions of the Uniform Performance Contract, including additional criteria established by the Council for inclusion in the performance contract pursuant to Section 34-2.3.
    The general superintendent must first approve written charges and specifications against the teacher or principal.

(DOC. 35)

P.O. Box 178523
Chicago, IL 60617
September 28, 2005

OFFICE OF THE
GENERAL SUPERINTENDENT

'05  SEP 28  A9 :38

CHICAGO PUBLIC ...

Rachel Resnick
Chief Labor Relation Officer
Board of Education / City of Chicago
125 S. Clark Street
Chicago, Illinois 60603

Kind & Peaceful Greetings Resnick:

Enclosed please find a copy of my doctor's statement attesting to the fact that i[1] am fit to return
to duty at any time, as well as a copy of a letter directed to Board President Michael Scott and
copied to Mayor Daley. As discussed in our previous telecommunications, nothing has ever
been sent to me in writing indicating that an extension of this leave was approved. It is against
Board Rules to extend a personal illness leave without a written request from the employee and
any other leaves or suspensions or lay-offs should be given at least 30 days in advance in writing.

As your office is over employee relations please give me in writing
* exactly why an extension of a personal illness leave was given,
* what Board rule or policy justifies such extended leave and
* indicate if this is being done with the approval of the Chief Executive Officer, Arne Duncan
  and
* the Board of Trustees
* and the method for appealing this unprecedented extension of an unjust leave causing
  irreparable harm to my family and me.

This cannot be a legal extension unless it is given in writing.

Respectfully,

Queen Tiye Searles
(773) 412-6595

Enclosure

CC:   Et al.

---

[1] Surviving this two year ordeal has humbled me to reserve big I for the Divine Creator who keeps us from the
Sunamis, Katrinas, Ritas, etc. in our daily lives.  I AM THAT I AM is the only Big I. We are all little i's here on
earth, some merely having Big Positions with Big Responsibilities and sometimes not realizing that in the EYES of
CREATION there are no Big i's and little u's and that attention should be given to every situation causing a Katrina
in the lives of those that we are given authority over no matter how insignificant we believe their position to be.

(DOC. 36)

EMPLOYEE
JAN 1 2 2006
MENTAL SERVICES

Queen Searles

10

During the interview, there was no evidence of any psychosis or thought disturbance. Her memory and orientation were good. Ms. Searles was able to relate the events in an appropriate manner. Ms. Searles did admit that she does not require much sleep and that her eating habits are not the best. She states that she often skips breakfast and doesn't really eat anything until the afternoon. She states that sometimes she works late into the night stating that she had to do this the previous night as she had to finish he drinks for the Kwanza celebration. She stated that her friend makes certain that she eats properly so she is doing better in that regard since she met him.

Ms. Searles states that she was in therapy with Diane Glenn for approximately six months and has never been on any psychotropic medications. She states that she has been evaluated by several psychiatrists and that none of them have felt that she is psychotic or is in need of medications. This was corroborated by the letters provided to me by the Board of Education.

**Symptom Check List (SCL-90)**
The SCL-90 did not evidence any problems. On the check list, Ms. Searles did admit to some depression which was her highest elevation but still remained within normal limits. No other problem areas were elicited from this instrument.

**Minnesota Multiphasic Personality Inventory-2 (MMPI-2)**
On the MMPI-2 Ms. Searles tended to be somewhat defensive and was prone to minimize any problems. This is to be expected given the nature of this evaluation, however, and should not be viewed as an unwillingness to be open during this evaluation. Based on this assessment measure, she is someone who is socially extroverted, outgoing, and gregarious. She has a strong need to be around other people. She is generally self confident, energetic and outgoing. She reports feeling comfortable and happy and generally views her life as stimulating and rewarding.

**Millon Clinical Multiaxial Inventory**
The Millon presents an indication of a person's personality style. Based on this assessment, Ms. Searles is someone who is conscientious and often perfectionistic. She has a strong need to do well and places high demands on herself. She requires praise and recognition for her accomplishments and will readily make grandiose statements of her own accomplishments. She is someone who is gregarious, extroverted, and socially engaging. She displays a confident demeanor with a high self regard and is generally socially charming. She seeks and enjoys attention from others.

**State-Trait Anger Expression Inventory-2 (STAXI-2)**
The STAXI-2 was given in order to assess Ms. Searle's expression of anger. Based on this assessment, Ms. Searles views anger as very socially unacceptable and works hard to control any feelings of anger. Any feeling of anger will automatically trigger a response to calm down and to internalize any expression of anger. Based on this assessment, Ms. Searles is not someone who would be expected to act out in anger towards others or herself.

**Personality Assessment Interview**
Results of the PAI indicate no evidence of clinical psychopathology although Ms. Searles did indicate a certain amount of turmoil in important life areas. Ms. Searles' self confidence

(Doc 37)

EMPLOYEE

JAN 1 2 2006

HEALTH SERVICES

Queen Searles

Is generally positive. She is self assured, confident, and dominant. She has and has a leader-like demeanor. She is comfortable in social settings but prefers to interact with others in situations over which she can exercise some measure of control.

## CONCLUSIONS AND RECOMMENDATIONS

Queen Tiyi Searles is a pleasant 46 year old female who was referred by the Chicago Board of Education for a Fitness for Duty Evaluation. Apparently, Ms. Searles has had difficulty with her employment with the Chicago Board of Education since 1998 when she got into an altercation with a student who had been disrespectful to her. This resulted in some stress for Ms. Searles, as well as legal proceedings, and culminated in a fitness for duty evaluation in which she was found unfit for duty.

While there is no question that some of the letters written by Ms. Searles are flamboyant and perhaps inappropriate in the way she chooses to address people in her letters, this, in itself, is not an indication of mental illness. In addition, her use of Biblical verses to make her point can also be viewed as unprofessional but again would not, in itself, be viewed as a cause for a diagnosis of mental illness. The behavior which is outlined in the letter from Dr. Boyd gives some cause for concern especially in light of the way Ms. Searles allegedly dressed and that she felt the need to bring her son to school with her. However, it is not enough to make a diagnosis of mental illness or to determine unfitness at the present time. In addition, Ms. Searles clearly presented a very different image to Dr. Lambert than she did in this current evaluation.

During the over one hour interview, Ms. Searles presented herself in an appropriate manner. She answered questions openly and did not evidence any psychosis or thought disorder. She presented as an intelligent, pleasant, and well versed individual who felt that she had been wronged and who has fought for some time to be reinstated into a position that she states that she loves. Results of the psychological assessments which were given to Ms. Searles and which provide a reliable and valid method of assessing personality and emotional well being did not elicit any cause for concern. Instead, Ms. Searles is seen as someone who is generally well adjusted, self confident, and ambitious. There was no indication that Ms. Searles presents a threat to children or to the people with whom she might work. As a result of this evaluation which lasted for over 5 hours, Ms. Searles is determined to be fit for duty at the present time.

Respectfully submitted,

Elizabeth H. Thompson, Psy.D.
Licensed Psychologist

(Doc. 37a)



**CHICAGO PUBLIC SCHOOLS**

**Department of Human Resources . Bureau of Employee Health Services**
125 South Clark Street, 2nd Floor . Chicago, IL 60603
Telephone 773/553-1180 . Fax 773/553-1181 . e-mail: EHS@csc.cps.k12.il.us
www.cps-humanresources.org

Sandra M. Johnson, R.N.
Case Manager

January 12, 2006

Ms. Queen Searles
8729 S. Commercial Ave.
Chicago, Illinois 60617

Dear Ms. Searles:

Employee Health Services received a report from Elizabeth H. Thompson, Psy.D, in which Dr. Thompson concludes that as of December 29, 2005, you are fit to return to duty. A copy of Dr. Thompson's report is enclosed for your information. Pursuant to Board Rules 4-12 and 4-13 and the Board's Supplemental Family and Medical Leave Policy, you are eligible to become a probationary assigned teacher, if a principal appoints you to a full-time teacher position. Because you were a first year probationary appointed teacher at the time your leave commenced, you will be classified as a second year probationary appointed teacher if a principal appoints you to a full-time teacher position.

An appointment with a teacher recruitment specialist, Mr. Michael Atilano, has been made for you at 125 South Clark Street, 2nd Floor, Chicago, Illinois, 60603 for Thursday, January 19, 2006 at 10:00 a.m. Mr. Atilano will work with you to identify employment opportunities within Chicago Public Schools.

Sincerely,

Sandra M. Johnson, R.N.
Case Manager

cc:    Mr. Ascension Juarez, Chief Officer, Human Resources
       Ms. Nancy Slavin, Director, Recruitment Center
       Mr. Michael Atilano, Recruitment Center

SMJ: elg

Enclosure

(DOC. 38)

2006-02-06 10:03          HR2N068        (773) 553-1081 >> 51324          P 1/1

**APPROVED**

Chicago Public Schools
Department of Human Resources
Recruitment and Substitute Services

## REQUEST FOR ADMINISTRATIVE TRANSFER

☑ Teacher                    ☐ Educational Support Personnel

Employee's Name: _Queen A. Tiye Searles_

Social Security Number: _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_

| SENDING | RECEIVING |
|---|---|
| School _MARSHALL_ | School _Price_ |
| Region _____ | Region _5/15_ |
| Position Number _47951_ | Position Number _07841_ |
| Subject/Title _____ | Subject/Title _Teacher_ |
| Effective Date _____ | Effective Date _2-5-06_ |

_____          _Dr. Gwendolyn E McChester_
Administrator's Signature          Administrator's Signature

_____          _February 6, 2006_
        Date                                  Date

Employee's Signature _Queen A Tiye Searles_

Date _2-6-06_

*Principals' signatures above provide their affirmation that there will be no program disruption
as a result of this administrative transfer and its effective date.

## For Recruitment and Substitute Services Use Only

**Teacher Transfers**
Sending School                              Receiving School

Check impact on compliance if pending          Check impact on compliance if pending
Personnel transaction is approved:             Personnel transaction is approved:

_____ Enhances Compliance          _____ Enhances Compliance
_____ Maintains Compliance          _____ Maintains Compliance
_____ Increases Noncompliance       _____ Increases Noncompliance

APPROVED: _T. Blair_                     _2/5/06_

Director, Recruitment and Substitute Services          Date
Revised 11/00

_(DOC. 39)_



ISAT Math % Meet/Exceed
2005 and 2006

(DOC. 40)